LUCERO, J., dissenting.
 

 My majority colleagues predicate their opinion on the premise that the Environmental Protection Agency ("EPA") has impermissibly adopted a test under which a refinery can demonstrate disproportionate economic hardship only upon a showing of an existential threat to ongoing operations. Whether that presumed test would pass muster may present an interesting question, but it is quite academic to the real issue before us. Assuredly, the EPA decisions include a regrettably inartful sentence-a partial quote from the 2011 Small Refinery Exemption Study issued by the Department of Energy (the "Department"). However, when construed as a whole, those decisions demonstrate that EPA applies a more nuanced analysis. Rather than adopting a one-factor test looking solely to whether a shutdown is likely, it seems clear to me that EPA is applying the three-pronged "viability metrics" developed by the Department. Under those standards, a refinery can establish economic hardship under four different circumstances, only one of which requires a threat of shutdown. Because the majority proceeds on a misconstruction of the EPA analysis, I must respectfully dissent.
 

 I
 

 In its decisions in this case, EPA discussed the Department's study at length.
 
 [1]
 
 It quotes the Department's determination
 that "[d]isproportionate economic hardship must encompass two broad components: [1] a high cost of compliance relative to the industry average, and [2] an effect sufficient to cause a significant impairment of the refinery operations." EPA explained that it asked the Department "to evaluate all of the information EPA receives from each petitioner" because the Department "has expertise in evaluating economic conditions at U.S. refineries, which it used in developing an assessment process for identifying when 'disproportionate economic hardship' exists in the context of the [Renewable Fuel Standard ("RFS") ] program."
 

 In resolving the two components of cost and sufficiency of the effect, the Department considers numerous factors which are grouped into two categories-structural and viability. In assessing "disproportionate structural impacts," the Department scores a refinery on eight metrics: percentage of diesel production, access to capital/credit, availability of other cash flows, local market, state regulation, relative refining margin, blending capability, and niche market. Under the "viability" category, the Department considers three metrics: whether compliance costs "would reduce the profitability of the firm enough to impair future efficiency improvements"; "[r]efinery specific events (such as a shutdown due to an accident, and subsequent loss of revenue) in the recent past that have a temporary negative impact on the ability of the refinery to comply"; and whether compliance costs are "likely to lead to shut down." Each metric is scored either 0, 5, or 10. Subtotal scores for the structural and viability categories are then averaged and divided by 2. The Department's study determined that an exemption would be warranted only if a refinery had an overall score of 1 or higher in both categories. For the viability category, a refinery can qualify with a score of 10 on any single metric, or with an intermediate score of 5 on both the efficiency and specific event metrics.
 

 After providing background information on Sinclair Wyoming Refinery's operations, the EPA decision reproduces the Department's scoring matrix for the facility. That metric calculated a score of 1.6 on the structural impact category, and 0 for the viability category. Then, EPA evaluated "viability using the metrics considered by [the Department] in its viability index: (a) compliance costs eliminate efficiency gains (impairment); (b) individual special events; and (c) compliance costs likely to lead to shut down." Considering the Department's score of zero on all three viability factors, EPA concluded that Sinclair Wyoming Refinery "remains fully able to comply with its 2014 RFS obligations without causing a significant impairment of the refinery's operations," and thus compliance would not threaten its "viability." EPA specifically considered Sinclair's argument that a fire at the refinery caused a large one-time loss-an argument clearly directed toward the specific event metric. And it discussed the RFS program's impact on efficiency gains as relevant to the first metric.
 

 The majority opinion does not consider this lengthy discussion. If it had, it would be abundantly clear that EPA considers all three of the Department's viability factors. Importantly, a refinery can qualify for an exemption under the Department's matrix without showing that compliance costs would lead to a shutdown. Rather than considering EPA's nuanced approach, the majority opinion focuses on the statement that a refinery must show that compliance costs would "significantly impact the operation of the firm, leading eventually to an inability to increase efficiency to remain competitive, eventually resulting in closure." (Majority Op. 995.) Read in context,
 that statement does not support the assertion that EPA applies a single-factor test under which a refinery must show a shutdown is likely.
 
 [2]
 

 The statement at issue is a direct quote from the Department's Small Refinery Exemption Study. In describing its three viability metrics, the Department explained that the term "viability refers to the ability of the refiners to remain competitive and profitable," which "requires sufficient profits to make investments in the refinery." That statement quoted by EPA explains that "under some circumstances, a small refinery may face compliance costs that would significantly impact the operation of the firm, leading eventually to an inability to increase efficiency to remain competitive, eventually resulting in closure." Read together with the Department's explanation of the metrics, the quoted passage shows that eventual closure is not required. Refineries may receive points under the efficiency metric because "significant constraints on efficiency improvements would eventually leave many small refineries at risk." And the individual special events metric is specifically aimed to provide relief to refineries that have suffered incidents causing "a temporary negative impact on the ability of the refinery to comply with the RFS."
 

 In discussing "viability" in the challenged decisions, EPA is referring to all three metrics-not just the possibility of refinery closure. The majority opinion's reliance on the ordinary usage definition of "viability," and its claim that EPA ignored the first two of the Department's viability metrics, (Majority Op. 996-97, 997-98), cannot be squared with the text of the challenged decisions. Those decisions unequivocally state that EPA "evaluates viability using the metrics considered by [the Department] in its viability index: (a) compliance costs eliminate efficiency gains (impairment); (b) individual special events; and (c) compliance costs likely to lead to shut down." Therefore, the appropriate question in reviewing the decisions at issue is whether that multi-factor analysis is consistent with the statute.
 

 II
 

 Regardless of the standard of review applied, EPA's adoption of the Department's three-part viability test should be upheld.
 
 See
 

 Edelman v. Lynchburg Coll.
 
 ,
 
 535 U.S. 106
 
 , 114 n.8,
 
 122 S.Ct. 1145
 
 ,
 
 152 L.Ed.2d 188
 
 (2002) ("[T]here is no need to resolve deference issues when there is no need for deference."). Congress specifically directed EPA to consider the findings of the Department's Small Refinery Exemption Study.
 
 42 U.S.C. § 7545
 
 (o)(9)(B)(ii). Consistent with the Congressional directive, that study created the viability standard actually being applied by EPA.
 

 Consideration of a refinery's overall health makes sense in light of the statute's use of the term "hardship." § 7545(o)(9)(B)(i). As the EPA decision notes, a refinery must show it "faces a
 'disproportionate economic
 
 hardship
 
 ' from compliance, and not merely an economic
 
 impact
 
 ." A refinery that spends $5 million per year to meet its RFS obligations and suffers net annual operating losses of $1 million per year would experience more of a "hardship" than a refinery that spends $10 million per year on RFS compliance but nevertheless operates at a profit.
 

 In an "Explanatory Statement" contained in the 2016 Consolidated Appropriations Act, Congress directed the Department to recommend a 50% waiver for refineries that score above 1 on the Department's matrix for either the viability or structural impact categories.
 
 See
 
 Consolidated Appropriations Act, 2016, Pub. L. No. 114-113,
 
 129 Stat. 2242
 
 (2015). Because that statement did not amend the statute, it should have little bearing on our analysis of the statutory text.
 
 See
 

 Bruesewitz v. Wyeth LLC
 
 ,
 
 562 U.S. 223
 
 , 242,
 
 131 S.Ct. 1068
 
 ,
 
 179 L.Ed.2d 1
 
 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."). As EPA explained, despite the appropriations rider, the agency "remains constrained by the plain governing statutory language that limits exemption extensions to small refineries that experience a 'disproportionate economic hardship.' " Moreover, as noted by EPA, "a refinery could satisfy the nonviability metrics as a result of primarily refining diesel and not having other lines of business, regardless of how profitable the refinery was or what the impact of compliance with the RFS would be on the refinery." I agree that "it would [not] be appropriate to grant even a 50% waiver for 'disproportionate economic hardship' in these circumstances without some further consideration of whether compliance with the RFS would actually cause such a hardship."
 

 Finally, reliance on the Department's study necessarily incorporates a disproportionality element. That study applied the Department's metrics to a broad cross-section of small refineries and found thirteen qualified for an exemption. Under that matrix, Sinclair's refineries do not qualify for an exemption for compliance year 2014. Even if the Department was required to depart from the study's findings due to an appropriations act requirement, EPA followed the statute when it relied on the Department's study in making these evaluations. The agency was mandated to consider both the study and the Department's recommendation. § 7545(o)(9)(B)(ii).
 

 Two other circuits have approved EPA's approach.
 
 See
 

 Lion Oil Co. v. EPA
 
 ,
 
 792 F.3d 978
 
 (8th Cir. 2015) ;
 
 Hermes Consol., LLC v. EPA
 
 ,
 
 787 F.3d 568
 
 (D.C. Cir. 2015). Hoping to avoid a circuit split, my majority colleagues unconvincingly attempt to distinguish these cases. They characterize both as having decided, unlike this case, whether EPA can consider viability as a factor, rather than the only factor. (Majority Op. 998-99.) As explained above, the majority's framing misstates what EPA did in the present case. The majority opinion also dismisses the cases claiming that those courts did not consider the appropriate degree of deference. But both decisions speak favorably of using viability as a factor.
 
 See
 

 Lion Oil
 
 ,
 
 792 F.3d at 984
 
 ("Of course, some refineries will face higher costs than others, but whether those costs impose disproportionate
 
 hardship
 
 on a given refinery presents a different question" and EPA reasonably concluded "that the best way to measure 'hardship' entail[s] examining the impact of compliance costs on a refinery's ability to maintain profitability and competitiveness-i.e., viability-in the long term." (quotation omitted));
 
 Hermes
 
 ,
 
 787 F.3d at 575
 
 (same). I would uphold, as well, EPA's
 consideration of viability as described in the Department's Small Refinery Exemption Study.
 

 There are two EPA decisions at issue, one denying an exemption to the Sinclair Wyoming Refinery and one denying an exemption to the Sinclair Casper Refinery. This dissent quotes from the former decision, but the latter is identical in all material respects.
 

 As the majority notes, EPA's brief repeats this statement in a footnote. (Majority Op. 18 n.5.) But as with the decisions at issue, the statement must be read in context. EPA's brief strenuously rejects the reading of its decisions urged by Sinclair and adopted by the majority. After quoting Sinclair's argument that a refinery must demonstrate that RFS compliance "will eventually force a small refinery to shut down," EPA states: "This is not an accurate characterization of EPA's interpretation because it gives the incorrect impression that the Agency will grant the exemption only if it concludes that the refinery will have to close if it has to comply with its RFS requirements." (Resp't Br. 40.) Instead, consistent with its decisions, EPA explains that "[t]he viability factor addresses three types of metrics that could impact long-term competitiveness, none of which necessarily would cause a closure of the facility in the near term." (
 
 Id.
 
 at 38-39.)