# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 27, 2023      Decided March 1, 2024

No. 23-5026

A.P. BELL FISH COMPANY, INC., ET AL.,
APPELLANTS

v.

GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF
COMMERCE, ET AL., APPELLEES

———

Appeal from the United States District Court for
the District of Columbia
(No. 1:22-cv-01260)

———

*J. Timothy Hobbs Jr.* argued the cause for appellants. With him on the briefs were *Michael Scanlon* and *John Longstreth*. *Natalie J. Reid* entered an appearance.

*John Sterne, Jr.* was on the brief for *amici curiae* Charter Fisherman's Association, et al. in support of appellants.

*Dina B. Mishra*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Todd Kim*, Assistant Attorney General, *Amanda C. Leiter*, Senior Counsel, and *Daniel Halainen*, Attorney. *Kevin W. McArdle*, Attorney, entered an appearance.

*Elizabeth B. Murrill*, Solicitor General, Office of the Attorney General for the State of Louisiana, and *Lawrence E. Marino*, Special Assistant Attorney General, were on the brief for intervenor-appellee State of Louisiana.

*Joshua Counts Cumby* and *Jeffrey E. Richardson* were on the brief for intervenor-appellee Coastal Conservation Association.

Before: MILLETT and PILLARD, *Circuit Judges,* and ROGERS, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* ROGERS.

ROGERS, *Senior Circuit Judge*: The National Marine Fisheries Service promulgated a Final Rule implementing Final Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico. 87 Fed. Reg. 25573 (May 2, 2022). Final Amendment 53 modifies the allocation of red grouper between the commercial and recreational sectors. Commercial fishers challenge Final Amendment 53 for relying on inconsistent economic analyses and failing to comply with the Magnuson-Stevens Fishery Conservation and Management Act. For the following reasons, the court affirms in part and reverses in part the grant of summary judgment, and remands the case, without vacating the rule, so the Fisheries Service can address whether the economic analysis underlying Final Amendment 53 was sufficiently different from that discredited

in adopting Final Amendment 28 in 2016 and the implications of further analysis for National Standards 4 and 9.

## I.

In 1976, Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.*, ("the Act") "to conserve and manage the fishery resources . . . of the United States," to "promote domestic commercial and recreational fishing under sound conservation and management principles," and to protect marine fisheries, among other purposes. *Id.* § 1801(b)(1), (b)(3), (a)(6). The Secretary of Commerce and eight Regional Fishery Management Councils share responsibility for federal fishery management. *See id.* §§ 1801(b)(5), 1802(39), 1852. The Act authorizes the Secretary of Commerce to delegate to the Fisheries Service the authority to implement proposed fishery management plans and their amendments. *See id.* §§ 1854, 1855(d).

Regional Councils prepare and implement fishery management plans to "achieve and maintain, on a continuing basis, the optimum yield from each fishery." *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 749 (D.C. Cir. 2000) (quoting 16 U.S.C. § 1801(b)(4)). Among other requirements, the plans must be consistent with the ten national standards of fishery conservation and management in the Act and set annual catch limits to prevent overfishing. 16 U.S.C. § 1853(a)(1)(C), (a)(15). Most relevant, National Standard 4 provides that the allocation of fishing privileges shall be "reasonably calculated to promote conservation," *id.* § 1851(a)(4)(B), and under National Standard 9, "to the extent practicable" shall "minimize bycatch and[,] . . . to the extent bycatch cannot be avoided, minimize the mortality of such bycatch," *id.* § 1851(a)(9). Fish that are caught but not sold or retained for personal use are "bycatch." *Id.* § 1802(2).

The Gulf of Mexico Fishery Management Council ("the Council") manages the reef fish fishery, including the red grouper. Red grouper is a fish primarily found in offshore hard bottom areas in the eastern Gulf of Mexico. The 2019 assessment of red grouper showed that the stock is not overfished and that overfishing is not occurring. Compared to the commercial sector, recreational fishers release a higher number of red grouper and tend to catch smaller, younger fish. The recreational sector consequently has higher levels of bycatch and bycatch mortality than the commercial sector. Collecting data from recreational fishers, the Fisheries Service determines their allocation of the total annual catch of red grouper. Final Amendment 30B allocated 76% of the annual catch limit to the commercial sector and 24% to the recreational sector using data from landings (*i.e.*, fish brought to shore) from 1986 to 2005. 74 Fed. Reg. 17603, 17608 (Apr. 16, 2009).

In 2007, Congress directed the Fisheries Service to improve the quality and accuracy of its data collection. *See* 16 U.S.C. § 1881(g)(3)(A). The following year the Fisheries Service created a new survey methodology. In Final Amendment 53, the Council recommended changing the commercial- and recreational-sector allocations to reflect updated data from new surveys. The Council's Scientific Committee proposed six allocation alternatives. The Council selected Alternative 3 because it "best reflects the historical participation by the commercial and recreational sectors, fairly and equitably distributes the needed reduction in catch between the sectors, and provides the greatest net economic benefits to the Nation." 87 Fed. Reg. at 25578. Alternative 3 became Final Amendment 53, reducing the commercial sector allocation from 76% to 59.3%, and increasing the recreational sector allocation from 24% to 40.7%. *See id.* at 25587.

The Council submitted Final Amendment 53 to the Fisheries Service. On December 9, 2021, the Fisheries Service

published a notice of availability and request for public comment. 86 Fed. Reg. 70078 (Dec. 9, 2021). On May 2, 2022, the Fisheries Service published the Final Rule, to take effect on June 1, 2022. 87 Fed. Reg. at 25573 ("the Final Rule").

## II.

Appellants, who are commercial fishers joined by two trade organizations, challenged the Final Rule on several grounds, including that Final Amendment 53 violates the Act and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (D). The district court was unpersuaded and granted summary judgment to the Secretary. *A.P. Bell Fish Co., et al. v. Raimondo et al.*, No. 22-cv-1260, 2023 WL 6159985, at *21 (D.D.C. Sept. 21, 2023). On appeal, appellants renew their argument that Final Amendment 53 arbitrarily relies on an economic analysis that the Fisheries Service had previously rejected. They also contend that Final Amendment 53 lacks the required catch limits and accountability measures, 16 U.S.C. § 1853(a)(15), and violates National Standards 4 and 9. The Secretary of Commerce, joined by the National Oceanic and Atmospheric Administration and the Fisheries Service (hereinafter "the Secretary"), responds that the Fisheries Service reconciled any inconsistencies with prior economic analyses, and that even if there are inconsistencies, it provided independent justifications for selecting Alternative 3 and Final Amendment 53 complies with the Act. The court's review is limited by the APA, 16 U.S.C. § 1855(f)(1)(B) (referencing 5 U.S.C. § 706(2)(A)–(D)), and in reviewing agency action directly affords "'no particular deference' to the district court's view of the law." *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (quoting *Daley*, 209 F.3d at 752).

**A.**

Final Amendment 28 revised the commercial and recreational allocations for the red snapper. 81 Fed. Reg. 25576 (Apr. 28, 2016). The Fisheries Service considered alternatives with differing allocation ratios of the red snapper between the commercial and recreational sectors. *See id.* at 25582. It determined that compared to the *status quo* the alternatives "would be expected to result in economic losses to the commercial sector and generate economic benefits for the recreational sector." Gulf of Mex. Fish. Mgmt. Council, Red Snap. Alloc'n: Final Amend. 28 (2015) at xiv (hereinafter "Final Amend. 28"). The Fisheries Service explained that it was "not possible to provide policy-relevant rankings of the reallocation alternatives in this amendment based on the expected net benefits to the nation," *i.e.*, "the sum of the change in economic benefits to the recreational and commercial sectors." *Id.* at 90. It concluded that "the use of the equimarginal principle, which means comparing the marginal values of the commercial and recreational sectors to determine the level of allocation to each sector that result in the greatest net economic benefits, is no longer valid." 81 Fed. Reg. at 25580. "[T]he recreational sector's open access system is not conducive to an efficient allocation within the sector," *id.*, because its "quota is not assigned to those participants who have the highest willingness to pay." Final Amend. 28 at 90.

Yet in Final Amendment 53 the Fisheries Service ranked allocation alternatives using the net-economic-benefit analysis it had rejected in adopting Final Amendment 28. *Compare* Gulf of Mex. Fish. Mgmt. Council, Red Grouper Alloc'ns & Ann. Catch Levels & Targets: Final Amend. 53 (Sept. 2021) at 104 (hereinafter "Final Amend. 53"), *with* Final Amend. 28 at 90, 278. The only explanation offered for this departure was that it was using the benefit measure to compare alternatives rather than to calculate a maximum net benefit. 87 Fed. Reg. at

25586. This appears to be a distinction without a difference. Nowhere in the record has the court found an explanation by the Fisheries Service of how an invalid methodology is any better at comparing the net benefit of options than calculating a maximum net benefit. Nor did questioning during oral argument prove illuminating. *See, e.g.*, Oral Arg. at 1:32:24–1:36:20.

The court generally remands agency decisions that are not supported by the record. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015). And a remand is required here because the court cannot discern whether "[the Fisheries Service] would have reached the same ultimate result had the errors [identified by the court] not been made." *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 579 (D.C. Cir. 2015) (internal quotation marks omitted); *see also Salt River Project Agric. Improvement & Power Dist. v. United States*, 762 F.2d 1053, 1060 n.8 (D.C. Cir. 1985). Throughout the rulemaking the Fisheries Service relied on the challenged economic analysis to support adoption of Alternative 3. For instance, the Fisheries Service noted that "[t]he Council determined that this allocation is fair and equitable and provides the greatest net economic benefits." Approval of Amend. 53 Mem. 1 (Mar. 8, 2022). Similarly, the Fisheries Service reiterated that the allocation in Alternative 3 "is fair and equitable and provides the greatest net economic benefits." Approval of a Final Rule to Implement Amend. 53 Mem. 2 (Apr. 14, 2022). The Fisheries Service also relied on this economic analysis in responding to comments that Final Amendment 53 complies with National Standards 4, 5, and 9. 87 Fed. Reg. at 25577–79. Indeed, it stated that four of the five alternatives were not selected, in part, because they would have resulted in "lower net economic benefits to the Nation compared to the action in the Final Rule." *Id.* at 25589. Although the Fisheries Service gave other reasons for not selecting each alternative, the weight placed on each is indiscernible. Consequently, the court

"cannot conclude with sufficient certainty that [it] would have made the same decision absent its errors." *Hermes Consol., LLC*, 787 F.3d at 579.

**B.**

Remand without vacatur is appropriate. There would appear to be a "strong possibility" that the Fisheries Service can differentiate between the two economic analyses. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 652 (D.C. Cir. 2016); *see Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). In technical areas, further explanation, with sufficient support from studies, may adequately inform the court of the Fisheries Service's reasoning. *See, e.g.*, Final Amend. 28 at 90.

**III.**

Appellants also contend that Final Amendment 53 is inconsistent with the statutory catch limit and National Standards 4 and 9. 16 U.S.C. §§ 1853(a)(15), 1851(a)(4), (9).

**A.**

Title 16 U.S.C. § 1853(a)(15) provides that "[a]ny fishery management plan . . . shall . . . establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *Id.* § 1853(a)(15). The Act does not define "catch," but the regulatory guidelines define "catch" to include both landed fish and dead discards. 50 C.F.R. § 600.310(f)(1)(i). Regional Councils must set an overfishing limit, defined as "the annual amount of catch that corresponds to" certain scientific estimates. *Id.* § 600.310(e)(2)(i)(D). Final Amendment 53 set the overfishing limit in terms of landings, not catch. *See* 87

Fed. Reg. at 25576. Appellants contend that this fails to establish "catch limits" or ensure accountability with them.

The district court properly rejected this argument. *A.P. Bell Fish*, 2023 WL 6159985, at \*17 & n.10. The overfishing limit recommended by the Council "accounts for all sources of mortality, including bycatch, because the stock assessment factors in that mortality. Because the annual catch limits are based on that overfishing limit, the annual catch limits account for bycatch in the same fashion." *Id.* at \*17 n.10 (internal citations omitted). "Section 1853(a)(15) requires 'only the establishment of [annual catch limits and accountability measures] such that overfishing does not occur,'" and does not require "the further step of setting an overfishing limit . . . that more directly accounts for bycatch." *Id.* (alteration in original) (internal citations omitted). Therefore, summary judgment to the Secretary was appropriate in that respect.

**B.**

National Standard 4 provides that "[i]f it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be . . . reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(4)(B). By regulation the Fisheries Service provides:

> An allocation scheme may promote conservation by encouraging a rational, more easily managed use of the resource. Or, it may promote conservation (in the sense of wise use) by optimizing the yield in terms of size, value, market mix, price, or economic or social benefit of the product.

50 C.F.R. § 600.325(c)(3)(ii). Further, the Fisheries Service explained that Final Amendment 53's allocation "promotes wise use by considering both the biological impacts to the red grouper stock, including preventing overfishing, and the

economic and social impacts to fishery participants." 87 Fed. Reg. at 25578.

Appellants urge that the plain text of National Standard 4 requires allocations of fishing privileges to independently promote conservation. Appellants' Br. 26. But it is not clear that Final Amendment 53 was an allocation for purposes of National Standard 4. Final Amendment 53 relies on the same historical landings as Final Amendment 30B. 87 Fed. Reg. at 25574. The only difference is that Final Amendment 53 uses more accurate survey data to extrapolate the historical recreational catch and enforce the recreational catch limit. *See* Final Amend. 53 at 16–17, 22. It is unclear such a methodological change effects a new allocation of fishing rights.

Even assuming without deciding that Final Amendment 53 is an allocation, the court need not now decide whether "conservation" should be interpreted with reference to wise use and the optimum yield, as the Secretary urges, or with reference solely to the vitality of a fishing stock, as appellants suggest. *Compare* Appellees' Br. for the Secretary 30–31, *with* Appellants' Br. 25–26. National Standard 4 applies to Final Amendment 53 as a whole and not just to the quota allocation component, Appellants' Br. 25–26. Under either definition, Final Amendment 53 might be sufficient to promote conservation by substantially reducing catch limits and promoting wise use. This may well depend on how the Fisheries Service addresses its reliance on the economic analysis it rejected in Final Amendment 28.

## C.

National Standard 9 directs the Fisheries Service, "to the extent practicable," to "minimize bycatch and[,] . . . to the extent bycatch cannot be avoided, [to] minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9). The Fisheries

Service concluded, "[g]iven the numerous factors that the Council must consider in selecting the appropriate allocation, [that Final] Amendment 53 does minimize bycatch and bycatch mortality to the extent practicable." 87 Fed. Reg. at 25579. Yet in balancing the practical constraints and the Act's competing objectives, the Fisheries Service had relied on the conclusion that Alternative 3 "results in the smallest reduction in net economic benefits to the Nation of the alternatives considered." *Id.* As noted regarding National Standard 4, the Fisheries Service may need to revisit whether further bycatch minimization is not practicable and provide additional support.

The Fisheries Service admitted that it did not consider measures to "directly reduce the bycatch of red grouper and other species." Final Amend. 53 at 207. Instead, it referenced the potential future use of measures that had already proved insufficient, including "catch limits, in-season and post-season accountability measures [], season and area closures, a minimum size limit, and a recreational bag limit," 87 Fed. Reg. at 25573, as well as gear requirements, Letter from the Secretary 2 (filed Sept. 30, 2023). Beyond that, the Fisheries Service reasoned that bycatch will decrease because overall catch limits are being reduced. Final Amend. 53 at 207. But this approach suggests that virtually any allocation that reduces a catch limit will satisfy National Standard 9, at least so long as the Fisheries Service reasonably concludes that additional measures were not practicable. The Fisheries Service appears not to have explained how that is a reasonable application of National Standard 9.

Accordingly, the court affirms in part and reverses in part the grant of summary judgment to the Secretary. The court will not reach the extent of the Fisheries Service's obligations under National Standard 9, and remands, without vacating the Final Rule implementing Final Amendment 53, so the Fisheries

Service can further explain its economic methodology and the effects on analysis of National Standards 4 and 9.