TYMKOVICH, Chief Judge.
 

 This matter comes on for consideration of the
 
 Petitioners' Unopposed Motion to Clarify the Court's Opinion
 
 . The motion is construed as a petition for rehearing.
 
 See
 
 Fed. R. App. P. 2 ("On its own or a party's motion, a court of appeals may-to expedite its decision or for other good cause-suspend any provision of these rules in a particular case and order proceedings as it directs ....); 10th Cir. R. 2.1 (The court may suspend any part of these rules in a particular case on its own or on a party's motion."). As so construed, the motion is granted. The Clerk is directed to accordingly amend the opinion issued on August 15, 2017.
 

 This order shall act as a supplement to the mandate issued on October 10, 2017.
 

 In an amendment to the Clean Air Act (CAA), Congress directed the EPA to operate a Renewable Fuel Standards Program (the RFS Program) to increase oil refineries' use of renewable fuels. But for small refineries that would suffer a "disproportionate economic hardship" in complying with the RFS Program, the statute required the EPA to grant exemptions on a case-by-case basis.
 

 We conclude the EPA has exceeded its statutory authority under the CAA in interpreting the hardship exemption to require a threat to a refinery's survival as an ongoing operation. That interpretation is outside the range of permissible interpretations of the statute and therefore inconsistent with Congress's statutory mandate. Because we find that the EPA exceeded its statutory authority, we vacate the EPA's decisions and remand to the EPA for further proceedings.
 

 I. Background
 

 In the Energy Policy Act of 2005, Congress amended the CAA to encourage the use of renewable fuels. The statute's RFS program requires oil refineries to either produce a sufficient proportion of renewable fuels as part of their output or purchase credits generated by other refineries to meet their increased renewable-fuel obligations.
 
 See
 

 42 U.S.C. § 7545
 
 (o) ;
 
 40 C.F.R. § 80.1429
 
 . But Congress also directed that small refineries may receive a statutory exemption if participation in the program would cause them "disproportionate economic hardship."
 
 42 U.S.C. § 7545
 
 (o)(9)(B).
 

 A. The Renewable Fuel Standards Program
 

 Through the RFS Program, Congress prescribed annual target volumes for renewable fuel sales, which increase each year until reaching a maximum level in 2022.
 
 [1]
 
 Congress charged the EPA with implementing the RFS Program and empowered it with authority to alter the statutory volumes of renewable fuel if the EPA finds that the RFS Program is causing severe economic or environmental harm or there is an inadequate supply of domestic renewable fuels. The EPA must also consult with the Department of Energy (DOE) in exercising this power.
 
 See
 

 42 U.S.C. § 7545
 
 (o)(7). The statute further requires "obligated parties," including "refineries, blenders, and importers," to comply with the RFS Program.
 
 42 U.S.C. § 7545
 
 (o)(3)(B)(ii).
 

 Under the EPA's accompanying regulations, an obligated party must satisfy its Renewable Volume Obligation each year
 by holding sufficient credits, known as Renewable Identification Numbers (RINs), at the end of each compliance year. A RIN is created when a producer makes a gallon of renewable fuel, blends the renewable fuel with petroleum-based fuel, and sells the resulting product domestically.
 
 40 C.F.R. § 80.1429
 
 . An obligated-party can accumulate RINs to meet its RFS Program requirement by: (1) blending renewable fuels into petroleum-based fuel and selling the product domestically; or (2) obtaining RINs through another source, such as the RIN trading system Congress directed the EPA to establish.
 
 See
 

 42 U.S.C. § 7545
 
 (o)(5). Put simply, the program induces refineries to produce renewable fuel products (e.g., ethanol), and if they cannot, to purchase biofuel-generated credits from refineries that can.
 

 B. Small Refinery Exemptions
 

 Congress was aware the RFS Program might disproportionately impact small refineries because of the inherent scale advantages of large refineries and therefore created three classes of exemptions to protect these small refineries.
 

 First, the statute exempted all small refineries from the RFS Program until 2011.
 
 42 U.S.C. § 7545
 
 (o)(9).
 

 Second, in the meantime, Congress directed DOE to conduct a study "to determine whether compliance [with the RFS Program] ... would impose a disproportionate economic hardship on small refineries" after the program's implementation.
 
 42 U.S.C. § 7545
 
 (o)(9)(A)(ii)(I). DOE conducted the study in 2011 and determined that a number of small refineries, including Sinclair's two Wyoming refineries, would suffer "disproportionate economic hardship" if they were required to comply with the RFS Program.
 
 [2]
 
 Accordingly, the EPA extended the blanket exemption for two more years.
 

 Third, after the exemption period expired, Congress provided a process for small refineries to petition the EPA "at any time" for an extension of the initial exemption "for reason of disproportionate economic hardship."
 
 42 U.S.C. § 7545
 
 (o)(9)(B)(i). In evaluating these petitions, the EPA must consult with DOE and consider the findings of DOE's study in addition to "other economic factors."
 
 42 U.S.C. § 7545
 
 (o)(9)(B)(ii).
 

 This third exemption is at issue in this case.
 

 C. Sinclair's Petitions for Small Refinery Exemptions
 

 Sinclair owns and operates two refineries in Wyoming: one located in Sinclair, Wyoming, and another in Casper, Wyoming. Both fall within the RFS Program's definition of "small refinery" and were exempt
 from the RFS requirements until 2011. Those exemptions were extended until 2013 after DOE found Sinclair's Wyoming refineries to be among the 13 of 59 small refineries that would continue to face "disproportionate economic hardship" if required to comply with the RFS Program.
 

 Sinclair then petitioned the EPA to extend their small-refinery exemptions, arguing that both refineries would continue to suffer "disproportionate economic hardship" under the RFS Program. The EPA denied Sinclair's petitions in two separate decisions, finding that both refineries appeared to be profitable enough to pay the cost of the RFS Program. Sinclair filed a timely petition for review with this court. We grant Sinclair's petition for review, vacate the EPA's decisions for both of Sinclair's refineries, and remand for further proceedings consistent with this opinion.
 

 II. Analysis
 

 We review Sinclair's petitions under the Administrative Procedure Act (APA). The APA requires courts to consider agency action in conformity with the agency's statutory grant of power, and agency action is unlawful if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."
 
 5 U.S.C. § 706
 
 (2)(C).
 
 See generally
 

 id.
 

 § 706 (describing additional agency actions that reviewing courts can hold unlawful and set aside, including arbitrary and capricious rulings).
 

 We review questions of statutory interpretation de novo.
 
 EnergySolutions, LLC v. Utah
 
 ,
 
 625 F.3d 1261
 
 , 1271 (10th Cir. 2010).
 

 A. Judicial Review of Agency Action
 

 When a court reviews an agency's legal determination, it generally applies the analysis set out by the Supreme Court in
 
 Chevron v. Natural Resources Defense Council
 
 ,
 
 467 U.S. 837
 
 ,
 
 104 S.Ct. 2778
 
 ,
 
 81 L.Ed.2d 694
 
 (1984). Under
 
 Chevron
 
 , reviewing courts apply a two-step analysis.
 
 Chevron
 
 step one asks "whether Congress has directly spoken to the precise question at issue."
 

 Id.
 

 at 842-43
 
 ,
 
 104 S.Ct. 2778
 
 . If Congress's intent is clear, then both the court and the agency "must give effect to the unambiguously expressed intent of Congress."
 

 Id.
 

 at 843
 
 ,
 
 104 S.Ct. 2778
 
 . Courts determine Congress's intent by employing the traditional tools of statutory interpretation, beginning-as always-with an examination of the statute's text.
 
 See
 

 New Mexico v. Dep't of Interior
 
 ,
 
 854 F.3d 1207
 
 , 1223-24 (10th Cir. 2017). But, if Congress has "not directly addressed the precise question at issue"-if "the statute is silent or ambiguous with respect to the specific issue"-the court must determine at
 
 Chevron
 
 step two "whether the agency's answer is based on a permissible construction of the statute."
 
 Chevron
 
 ,
 
 467 U.S. at 843-44
 
 ,
 
 104 S.Ct. 2778
 

 .
 

 In some circumstances, however, a court never reaches the
 
 Chevron
 
 analysis. In such cases, we do not need to answer the step one or step two questions. As the Supreme Court explained in
 
 United States v. Mead Corp.
 
 ,
 
 533 U.S. 218
 
 ,
 
 121 S.Ct. 2164
 
 ,
 
 150 L.Ed.2d 292
 
 (2001), the initial step of the
 
 Chevron
 
 inquiry is actually to determine whether
 
 Chevron
 
 should
 
 apply at all
 
 .
 
 See
 
 Cass R. Sunstein,
 
 Chevron Step Zero
 
 ,
 
 92 Va. L. Rev. 187
 
 , 247 (2006) (conceptualizing the inquiry of whether
 
 Chevron
 
 applies as "
 
 Chevron
 
 step zero");
 
 see also
 

 Gutierrez-Brizuela v. Lynch
 
 ,
 
 834 F.3d 1142
 
 , 1157 (10th Cir. 2016) (Gorsuch, J., concurring) (discussing the step zero inquiry and the confusion created by
 
 Mead
 
 ).
 
 [3]
 

 In
 
 Mead
 
 , the Court held that
 
 Chevron
 
 applies only where "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."
 
 Mead
 
 ,
 
 533 U.S. at 226-27
 
 ,
 
 121 S.Ct. 2164
 
 . This context-driven determination requires us to examine the method by which the agency exercised its delegated authority.
 
 Mead
 
 instructs: "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."
 

 Id.
 

 at 229-30
 
 .
 
 Mead
 
 thus created, in effect, a "safe harbor of
 
 Chevron
 
 deference" for agency interpretations produced via formal agency action-formal rulemaking or adjudication-and those produced via informal notice-and-comment rulemaking. Charles H. Koch, Jr. & Richard Murphy, 3 Admin. L. & Prac. § 10:12 (Feb. 2017 update) ;
 
 see also
 
 Richard J. Pierce, Jr.,
 
 Administrative Law Treatise
 
 , § 3.5 (2010) ("After
 
 Mead
 
 , it is possible to know only that legislative rules and formal adjudications are always entitled to
 
 Chevron
 
 deference, while less formal pronouncements like interpretative rules and informal adjudications may or may not be entitled to
 
 Chevron
 
 deference.").
 

 In situations where
 
 Chevron
 
 does not apply,
 
 Mead
 
 requires us to examine the persuasiveness of agency action with no thumb on the scale of judicial deference. As
 
 Mead
 
 explained, we follow the analysis set forth in
 
 Skidmore v. Swift & Co.
 
 ,
 
 323 U.S. 134
 
 ,
 
 65 S.Ct. 161
 
 ,
 
 89 L.Ed. 124
 
 (1944). In that case, the Court explained that the weight courts provide an administrative judgment "will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."
 

 Id.
 

 at 140
 
 ,
 
 65 S.Ct. 161
 
 .
 

 Following
 
 Mead
 
 , the Court examined agency action that was less formal than notice-and-comment rulemaking when it reviewed an opinion letter issued by the Social Security Administration.
 
 See
 

 Barnhart v. Walton
 
 ,
 
 535 U.S. 212
 
 , 221-22,
 
 122 S.Ct. 1265
 
 ,
 
 152 L.Ed.2d 330
 
 (2002). It found that such informal agency action "does not automatically deprive that interpretation of the judicial deference otherwise its due," but rather, whether courts provide
 
 Chevron
 
 deference "depends in significant part upon the interpretive method used and the nature of the question at issue."
 

 Id.
 

 The factors the Court considered included the interstitial nature of the legal question, the related expertise of the agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the agency had given the question over a long period of time.
 

 Id.
 

 at 222
 
 ,
 
 122 S.Ct. 1265
 
 .
 

 The question we must answer, then, is whether to apply
 
 Chevron
 
 or
 
 Skidmore
 
 deference to the EPA's use of informal adjudications to resolve Sinclair's petitions.
 

 See
 

 WildEarth Guardians v. Nat'l Park Serv.
 
 ,
 
 703 F.3d 1178
 
 , 1188 (10th Cir. 2013). Sinclair argues that we should review the EPA's decisions using only
 
 Skidmore
 
 deference, but maintains it would still prevail under a more deferential
 
 Chevron
 
 review. Aplt. Supp. Br. at 1-2. The EPA, of course, argues the opposite.
 

 As a preliminary matter, we acknowledge that the EPA's decisions resolving Sinclair's hardship petitions were conducted via informal adjudication (the same procedure employed by the U.S. Customs Service in
 
 Mead
 
 ). The parties do not seriously contest this conclusion. The decisions were
 
 adjudications
 
 because they were specific to the parties at issue-in fact, they were specific even to the individual refineries at issue (the EPA produced separate decisions for the Sinclair, Wyoming and Casper, Wyoming refineries)-and were resolving petitions for Sinclair's exemptions from the RFS Program. The decisions were also
 
 informal
 
 because they were resolved on the basis of Sinclair's submissions and involved no oral argument, opportunity for cross-examination, or other "trial-like" procedures generally required by the APA.
 
 See
 
 Pierce,
 
 supra
 
 , at Vol. 1 § 8.2 (describing the trial-like procedures the APA requires for formal adjudications);
 
 see also
 
 J.A. Vol. 1 at 31 (the Casper, Wyoming refinery opinion describing Sinclair's submission).
 

 Under
 
 Mead
 
 , we conclude that
 
 Skidmore
 
 deference applies to the EPA's decision here. First of all, Congress specifically authorized the EPA to promulgate regulations on aspects of the RFS Program, but not for the small refinery exemptions. This means the agency did not have the benefit of notice-and-comment about its interpretation of the term "disproportionate economic hardship."
 
 See, e.g.
 
 ,
 
 42 U.S.C. § 7545
 
 (o)(2)(A)(i) (requiring the EPA to promulgate regulations to "ensure that gasoline sold or introduced into commerce in the United States ... contains the applicable volume of renewable fuel")
 
 .
 
 Instead, the EPA conducted its interpretation via informal adjudication. And the fact that the adjudication was
 
 informal
 
 is also important-Sinclair's involvement in the decision-making was limited to submitting petitions and the EPA did not have the benefit of hearing expert testimony on the topic.
 
 See
 
 Pierce,
 
 supra
 
 , at Vol. 1 § 8.2 (describing the trial-like procedures required for formal adjudications).
 

 Additionally, the decisions were not made by the head of the EPA but instead by a mid-level Agency official.
 
 See
 
 Aplt. Supp. Br. at 7-8;
 
 see also, e.g.
 
 ,
 
 Groff v. United States
 
 ,
 
 493 F.3d 1343
 
 , 1352 (Fed. Cir. 2007) (one factor in the court's conclusion that it should provide
 
 Chevron
 
 deference to the agency action was that the adjudication at issue was "formal and culminate[d] in a formal written decision by the head of the agency, not a nonbinding disposition by a low-level agency official").
 

 Next, the decisions hold no precedential value for third parties. Indeed, the decisions have no precedential value even for the
 
 refiner
 
 , since each petition must be resolved on a case-by-case basis (again, the EPA produced two decisions, one for each of Sinclair's refineries). Nor do third parties have access to the decisions, since the EPA does not publicly release its decisions because they contain confidential business information. Aple. Supp. Br. at 8.
 

 Finally, the EPA's viability analysis is not a longstanding practice, but is, instead, only a few years old.
 
 [4]
 

 Thus,
 
 Mead
 
 and
 
 Barnhart
 
 compel our conclusion that Congress did not intend the EPA's interpretation of "disproportionate economic hardship" to have the "force of law." We therefore apply
 
 Skidmore
 
 deference in reviewing the EPA's interpretation.
 

 B. The "Disproportionate Economic Hardship" Exemption
 

 In analyzing Congress's grant of power to the EPA to administer the RFS Program, we begin, as always, with the statutory text. "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning."
 
 BP Am. Prod. Co. v. Burton
 
 ,
 
 549 U.S. 84
 
 , 91,
 
 127 S.Ct. 638
 
 ,
 
 166 L.Ed.2d 494
 
 (2006) ;
 
 see also
 

 Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.
 
 ,
 
 541 U.S. 246
 
 , 252,
 
 124 S.Ct. 1756
 
 ,
 
 158 L.Ed.2d 529
 
 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").
 

 1. The Statutory Requirement
 

 As previously mentioned, Congress provided that small refineries could petition the EPA to extend their initial exemption from the RFS Program "for reason of disproportionate economic hardship."
 
 42 U.S.C. § 7545
 
 (o)(9)(B)(i). The relevant statutory provision reads in full:
 

 (B) Petitions based on disproportionate economic hardship
 

 (i) Extension of exemption
 

 A small refinery may at any time petition the [EPA] Administrator for an extension of the exemption under subparagraph (A)
 
 for the reason of disproportionate economic hardship
 
 .
 

 (ii) Evaluation of petitions
 

 In evaluating a petition under clause (i), the [EPA] Administrator,
 
 in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors
 
 .
 

 42 U.S.C. § 7545
 
 (o)(9) (emphasis added).
 

 Although Congress did not define the term "disproportionate economic hardship" in the statute, the provision makes clear that Congress provided the EPA with a comprehensive directive in analyzing and evaluating RFS Program exemptions. The statute prescribes the overall process: (1) when petitions can be made: "at any time"; (2) the relevant agency actors: the EPA must make decisions in "consultation with" DOE; (3) the relevant question: whether a refinery will suffer "disproportionate economic hardship" if it is required to participate in the RFS Program for a given year; and (4) the methodology the agency is to use: the EPA must consider the findings of DOE's 2011 study and "other economic factors."
 
 42 U.S.C. § 7545
 
 (o)(9)(B).
 

 With this statutory background, we turn to whether the EPA's decisions comport with Congress's directive to grant exemptions when a small refinery demonstrates that complying with the RFS Program would cause it to suffer a "disproportionate economic hardship."
 

 2. The EPA's Decisions
 

 Prior to considering a refinery's petition for a hardship exemption, the EPA receives a recommendation on the petition from DOE. In its 2011 study, DOE created a scoring matrix for determining its recommendations for granting exemptions. The first part of the matrix assesses the "disproportionate structural and economic" impacts of the RFS Program on the refinery,
 looking both at (1) "disproportionate structural impact metrics" (a refinery's percentage of diesel production, access to credit, local market acceptance of renewable fuels, etc.) and (2) "disproportionate economic impact metrics" (the firm's relative refining margin, the degree to which the refiner can blend renewable fuels, whether RINs are a net source of revenue, etc.). J.A. Vol. 1 at 99-102 (DOE's 2011 Small Refinery Exemption Study).
 

 The second part of DOE's matrix assigns scores for three "viability metrics": "(1) whether the cost of compliance 'would reduce the profitability of the firm enough to impair future efficiency improvements;' (2) whether 'individual special events' have had 'a temporary negative impact on the ability of the refinery to comply;' and (3) whether compliance costs are 'likely to lead to shutdown' of the refinery." Aplt. Br. at 13-14 (quoting J.A. Vol. 1 at 103-04).
 

 DOE's interpretation of its methodology does not require that the cost of compliance threaten a refinery's long-term viability. Instead, DOE recommends a 50 percent waiver if the ranking meets a certain threshold on either side of the matrix, although the DOE previously required the ranking meet certain thresholds on
 
 both
 
 sides of the matrix. J.A. Vol. 1 at 17. DOE's scoring change "is due to language included in an explanatory statement accompanying the 2016 Consolidated Appropriations Act," which instructed the DOE as follows: " 'If the Secretary finds that either of these two components exists, the Secretary is directed to recommend to the EPA Administrator a 50 percent waiver of RFS requirements for the petitioner.' "
 

 Id.
 

 (quoting Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 (2015)).
 

 Here, DOE applied its matrix methodology and recommended the EPA provide a 50 percent waiver of the RFS Program's requirements for both of Sinclair's refineries.
 
 See
 
 J.A. Vol. I at 15-17 (Sinclair, Wyoming refinery decision); J.A. Vol. I at 35-37 (Casper, Wyoming refinery decision).
 

 The EPA rejected DOE's recommendations and denied both petitions.
 

 In denying Sinclair's exemption for the Sinclair, Wyoming refinery, the EPA explained its view that "disproportionate economic hardship" requires a threat to the "longer term prospects" of a refinery:
 

 EPA believes viability continues to be an important economic factor for determining "disproportionate economic hardship." ....
 
 We consider whether [the Sinclair, Wyoming refinery] will remain a competitive and profitable refinery while satisfying its RFS obligations. EPA notes that it considers profitability not merely in the context of a single year's financial statements, but also in the context of assessing the
 
 longer term prospects
 
 for the refinery. EPA also evaluates viability using metrics considered by DOE in its viability index: (a) compliance costs eliminate efficiency gains (impairment); (b) individual special events; and (c) compliance costs likely to lead to shut down. In reaching our conclusion, we consider all of this information on viability, and additional relevant information as available, to determine whether [the Sinclair, Wyoming refinery] faces a "disproportionate economic
 
 hardship
 
 " from compliance, and not merely an economic
 
 impact
 
 .
 

 J.A. Vol. 1 at 18-19 (quoting DOE 2011 Small Refinery Study) (citations omitted) (emphasis added in first sentence);
 
 see also
 

 id.
 

 at 38-39
 
 (EPA's identical analysis in its denial of Sinclair's petition for the Casper, Wyoming refinery).
 

 In applying this long-term viability interpretation, the EPA rejected DOE's matrix scores for both Sinclair refineries. The
 EPA concluded that "viability" meant only that program costs threatened the "long-term" survival of the refinery, not a short-term comparison to other industry actors:
 

 In the discussion that follows, EPA independently reviews the information as we consider other economic factors in our analysis, including, but not limited to, profitability, net income, cash flow and cash balances, gross and net refining margins, ability to pay for refinery improvement projects, corporate structure, debt and other financial obligations, RIN prices, and the cost of compliance through RIN purchases. After considering all of this information, EPA finds [the Sinclair, Wyoming refinery] will not experience "disproportionate economic hardship" from compliance with the RFS program.
 

 As an initial matter,
 
 EPA recognizes its decision differs from DOE's recommendation
 
 . The CAA requires that EPA act on a small refinery's petition "in consultation with" DOE, "consider[ing] the findings of" the DOE Small Refinery Study and "other economic factors." EPA gives weight to DOE's technical evaluation and scoring of the refinery, recognizing that DOE has more experience in assessing, e.g., the impact of a particular special event, and how to balance short-term events with longer term planning and concerns over viability.
 
 However, EPA has responsibility for making the ultimate decision after considering DOE's evaluation and recommendation, and continues to believe that the proper interpretation of the statutory prerequisite-disproportionate economic hardship-involves
 
 "
 
 examining the impact of compliance costs on a refinery's
 

 ability to maintain profitability and competitiveness-i.e. viability-in the long term.
 
 "
 

 J.A. Vol. 1 at 17-18 (quoting CAA section 211(o)(9)(B)(ii) and, in last sentence,
 
 Hermes Consol., LLC v. EPA
 
 ,
 
 787 F.3d 568
 
 , 575 (D.C. Cir. 2015) ) (emphasis added).
 

 Thus, according to the EPA, to show "disproportionate economic hardship" a small refinery must demonstrate an existential threat: it "faces RFS compliance costs that would '
 
 significantly impact the operation of the firm, leading eventually to an inability to increase efficiency to remain competitive, eventually resulting in closure
 
 .' "
 
 [5]
 
 J.A. Vol. 1 at 19-20 (quoting DOE Small Refinery Study) (emphasis added);
 
 see also
 

 id.
 
 at 39-40 (EPA's identical analysis in its denial of Sinclair's petition for the Casper, Wyoming refinery).
 

 As we discuss next, the EPA's long-term threat of closure requirement is inconsistent with the plain meaning of "disproportionate economic hardship."
 

 3. The Plain Meaning of "Disproportionate Economic Hardship"
 

 Sinclair claims the EPA's position is that "no matter how disproportionate
 the economic
 
 impact
 
 of the RFS Program on other refineries, there can be no 'disproportionate economic
 
 hardship
 
 ' unless compliance with the RFS Program is so costly that it will eventually force a small refinery to shut down," and argues that this position is contrary to the plain language of the term "disproportionate economic hardship." Aplt. Br. at 34. Sinclair also maintains that the EPA's "viability" test not only fails the agency's statutory duty to compare the refinery at issue with its competitors, but also requires significantly more "hardship" to the refinery than the statute instructs.
 
 [6]
 

 The statutory text at issue allows a range of linguistic possibilities in defining "disproportionate economic hardship." But as we discuss below, the EPA's interpretation falls outside the boundaries of permissible choice. It chose a definition of economic hardship plainly at odds with Congress's statutory command by reading a "viability" requirement into the statute and the "disproportionate" requirement out of it.
 

 We first evaluate Sinclair's argument that the EPA improperly imported a condition of future long-term viability into the statutory language. This question is hardly in dispute, because the EPA admits as much. The EPA concluded its decision for the Sinclair, Wyoming refinery with the following statement:
 

 EPA does not doubt that Sinclair incurred costs, both planned and unplanned, which affected profitability. However, as discussed above,
 
 EPA believes that it is necessary to show that RFS compliance will have an impact on the refinery's ongoing future viability to be eligible for an exemption
 
 . After considering the full financial picture of [the Sinclair, Wyoming refinery] for 2014 and prior years, EPA does not find that compliance with RFS for 2014 would threaten [the Sinclair refinery]'s viability. Given [the Sinclair refinery]'s situation, we do not believe that an RFS exemption for [the Sinclair refinery] is justified under the statutory requirement of a disproportionate economic hardship.
 

 J.A. Vol. 1 at 20-21 (emphasis added);
 
 see also
 

 id.
 
 at 39-40 (similar language in the Casper, Wyoming refinery opinion).
 

 The EPA's use of the word "necessary" proves Sinclair's point. If long-term "viability" was merely
 
 one
 
 element the EPA considered in its "disproportionate economic hardship" analysis, that would be a different story. But by stating that future viability (meaning whether the firm will go out of business) is
 
 necessary
 
 to-in effect, the
 
 sine qua non
 
 of-its decision, the EPA demonstrates it will not grant an exemption
 
 unless
 
 there is a threat to a refinery's long-term viability.
 

 The EPA's interpretation takes the statutory language too far. First, as a matter of textual exegesis, a " 'hardship' " is something that "makes one's life hard or difficult-not just something that makes continued existence impossible." Aplt. Br. at 35;
 
 see Oxford English Dictionary
 
 (2017) (defining "hardship" as "[s]omething which is hard to bear");
 
 Black's Law
 

 Dictionary
 
 (10th ed. 2014) (defining "hardship" as "[p]rivation; suffering or adversity");
 
 Webster's Third New Int'l Dictionary
 
 1033 (1971) (defining "hardship" as "something that causes or entails suffering or privation").
 

 "[V]iability," on the other hand, is the "ability to continue or be continued; the state of being financially sustainable."
 
 Oxford English Dictionary
 
 (2017);
 
 see also Webster's Third New Int'l Dictionary
 
 2548 (1971) (defining "viability" as "the quality or state of being viable," and defining "viable," in turn, as "capable of living"). As a matter of common sense, an experience that causes hardship is less burdensome than an experience that threatens one's very existence. Our law clerks, for example, might say their first year of law school was a "hardship" they suffered, but they could hardly claim that the experience of learning the law threatened their very "viability" (we hope).
 

 The EPA argues that "viability" and "hardship" are the same, since "hardship" can be defined as "suffering" and "privation." Aple. Br. at 38. But as we just explained, "suffering" and "privation" may be difficult to bear, but they do not necessarily rise to the level of threatening one's very existence. And the EPA's interpretation of "viability" is akin to a death knell, not simple privation. In any event, DOE's matrix analysis supplied three "viability metrics" that collectively determine hardship: (1) reduced profitability; (2) temporary negative events; and (3) risk of closure.
 
 See
 
 J.A. Vol. 1 at 103. The EPA's interpretation ignores two-thirds of this analysis and selects only risk of closure as the appropriate measure of hardship. This is not a reasonable interpretation of the statutory term. In short, the EPA's equation of "hardship" and "viability" improperly transforms Congress's statutory text into something far beyond what Congress plausibly intended.
 

 The statute also commands the EPA to consider the
 
 disproportionate
 
 impact of the RFS Program, which inherently requires a comparative evaluation. The EPA must compare the effect of the RFS Program compliance costs on a given refinery with the economic state of other refineries. The EPA's viability test involves no such comparison, but instead looks at each refinery in isolation and asks whether the cost of long-term compliance with the RFS Program would force the refinery to shut down. By making long-term viability a necessary factor in its analysis, the EPA impermissibly reads the word "disproportionate" out of the statute.
 
 See
 

 Clark v. Rameker
 
 , --- U.S. ----,
 
 134 S.Ct. 2242
 
 , 2248,
 
 189 L.Ed.2d 157
 
 (2014) ("a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous"). The EPA tries to sidestep the comparative nature of the "disproportionate economic hardship" by pointing out that the statute requires the EPA to consider DOE's study and "other economic factors." Because viability is one of the factors considered by DOE, the EPA argues it is also an appropriate consideration for the EPA.
 
 See
 
 Reply Br. at 11. But as we explained above, the statutory requirements for what
 
 sources
 
 the EPA must consider in evaluating the petitions are distinct from the overall
 
 purpose
 
 of the inquiry. In effect, the EPA takes the holistic evaluation required by Congress and morphs it into a single question: a threat of closure inquiry.
 

 The EPA's narrow viability evaluation is also not supported by contextual clues in the statutory scheme. Congress, in fact, directed the EPA to apply a closure test for another part of the CAA involving primary nonferrous smelter orders.
 
 42 U.S.C. § 7419
 
 (d)(2) (requirement to use continuous
 emission reduction technology can be waived "upon a showing by the owner or operator of the smelter that
 
 such requirement would be so costly as to necessitate permanent or prolonged temporary cessation of operations
 
 of the smelter." (emphasis added)). Although this CAA provision is not part of the RFS Program, it makes the basic point that Congress knows how to supply a closure test when it intends to do so.
 
 See
 
 Antonin Scalia & Bryan A. Garner,
 
 Reading Law: The Interpretation of Legal Texts
 
 170-73 (2012) (discussing the presumption of consistent usage).
 

 The EPA places significant weight on two recent circuit court decisions addressing § 7545(o)(9)(B)(ii), which it claims support its interpretation of the statute:
 
 Hermes Consolidated, LLC v. EPA
 
 ,
 
 787 F.3d 568
 
 (D.C. Cir. 2015) and
 
 Lion Oil Company v. EPA
 
 ,
 
 792 F.3d 978
 
 (8th Cir. 2015). In
 
 Hermes
 
 , a refinery challenged the EPA's denial of its extension for an economic hardship exemption from the RFS Program (a denial supported by DOE's matrix scheme). The court rejected the refinery's challenge under
 
 Chevron
 
 step one, concluding that the EPA's reliance on a viability index did not contradict the plain language of § 7545(o)(9)(B) because so long as "EPA consults with DOE and considers the 2011 Study and 'other economic factors,' EPA retains substantial discretion to decide how to evaluate hardship petitions."
 
 Hermes
 
 ,
 
 787 F.3d at 574-75
 
 (internal citation omitted). The D.C. Circuit also rejected the refinery's
 
 Chevron
 
 step two argument, concluding that the EPA's method of evaluating " 'disproportionate economic hardship' is 'based on a permissible construction of the statute.' "
 

 Id.
 

 at 575
 
 (quoting
 
 Chevron
 
 ,
 
 467 U.S. at 843
 
 ,
 
 104 S.Ct. 2778
 
 ). In other words, the court found it reasonable for the EPA to incorporate the methodology from the 2011 DOE study, and the viability matrix in particular, because the statute requires the EPA to consider the findings of the study and "other economic factors" in evaluating hardship petitions. Thus, the court concluded the EPA's choice was within its discretion under
 
 Chevron
 
 step two.
 
 See
 
 id.
 

 In
 
 Lion Oil
 
 , the Eighth Circuit also rejected the refinery's
 
 Chevron
 
 step one argument. The court stated that since the statute does not define "disproportionate economic hardship," and Congress delegated authority to the agency to implement an ambiguous statute, the court was " 'required to accept the agency's statutory interpretation, so long as it is reasonable.' "
 
 792 F.3d at 984
 
 (quoting
 
 Fast v. Applebee's Int'l, Inc.
 
 ,
 
 638 F.3d 872
 
 , 876 (8th Cir. 2011) ). The Eighth Circuit concluded that the EPA's choice to measure "hardship" by examining the refinery's viability in the long run was within the agency's discretion, and was thus reasonable.
 

 Id.
 

 But these cases are distinguishable. As an initial matter, neither the D.C. Circuit nor the Eighth Circuit considered whether
 
 Mead
 
 should control its interpretation of the statute; instead, both courts assumed that
 
 Chevron
 
 applied. Regardless, as we explained above,
 
 Mead
 
 instructs us that
 
 Skidmore
 
 deference is the appropriate standard of review to apply to an informal adjudication that does not carry "the force of law."
 

 The petitioner in
 
 Hermes
 
 argued that mere "[c]onsideration of a viability index" was "inconsistent with [the EPA's] statutory mandate."
 
 787 F.3d at 574
 
 . In other words, the EPA could not consider a refinery's viability
 
 at all
 
 , even if viability was considered along with a host of other economic factors. The D.C. Circuit properly rejected that argument. The statutory scheme does not prohibit the EPA from considering viability as a factor. But as we explained above, when the EPA makes
 long-term viability the
 
 necessary
 
 , if not the sole, factor-refusing to grant an exemption unless there is a threat to a refinery's long-term viability-it renders an interpretation outside the bounds of permissible statutory choice.
 

 As for
 
 Lion Oil
 
 , the Eighth Circuit's decision does not make clear whether the petitioner argued it was impermissible for the EPA to consider viability as
 
 a factor
 
 in its analysis (as in
 
 Hermes
 
 ) or as the
 
 sole factor
 
 in its analysis (as in this case).
 
 See
 

 792 F.3d at 984
 
 . Either way, we are unpersuaded. If the former, our analysis of
 
 Hermes
 
 applies. If the latter,
 
 Lion Oil
 
 improperly interpreted
 
 Hermes
 
 as rejecting the EPA's use of viability as the sole factor in its "disproportionate economic hardship" analysis before relying entirely on the D.C. Circuit's reasoning.
 
 See
 
 id.
 

 Consequently, we are unpersuaded by the court's analysis in
 
 Lion Oil
 
 .
 

 Mead
 
 instructs us to defer to agency interpretations of a statute only to the extent those decisions have the "power to persuade."
 
 533 U.S. at 220
 
 ,
 
 121 S.Ct. 2164
 
 . Since our textual and contextual analyses demonstrate that the EPA's interpretation of § 7545(o)(9)(B) is contrary to the meaning and purpose of the statute, the EPA has failed to persuade us here.
 

 III. Conclusion
 

 By reading a necessary "viability" requirement into its statutory directive to evaluate a refinery's petition for exemption from the RFS program based on "disproportionate economic hardship," the EPA exceeded its statutory authority. We therefore GRANT Sinclair's petition for review, VACATE the EPA's decisions for Sinclair's two Wyoming refineries, and REMAND for further proceedings consistent with this opinion.
 

 Sinclair's June 24, 2016 motion to seal the docketing statement and agency decision documents and its September 9, 2016 motion to seal all the briefs and the joint deferred appendix are GRANTED.
 

 The RFS Program is codified as Clean Air Act § 211(o),
 
 42 U.S.C. § 7545
 
 (o)(7).
 

 DOE actually completed its first study in 2009, concluding that no small refineries would suffer "disproportionate economic hardship" if they were required to comply with the RFS Program. But Congress was unhappy with DOE's methodology and directed the Agency to conduct a new study, requiring it to "seek and invite comment from small refineries on the RFS exemption hardship question, assess RFS compliance impacts on small refinery utilization rates and profitability, evaluate the financial health and ability of small refineries to meet RFS requirements, study small refinery impacts and regional dynamics by PADD, and reassess the accuracy of small refinery compliance costs through the purchase of renewable fuel credits."
 
 See
 
 S. Rep. No. 111-45, at 109 (2009),
 
 2009 WL 1994747
 
 .
 

 DOE completed its second study in 2011, concluding that "[i]f certain small refineries must purchase RINs that are far more expensive than those that may be generated through blending, this will lead to disproportionate economic hardship for those effected entities." J.A. Vol. 1 at 69 (alteration incorporated).
 

 We note that neither party discussed the Supreme Court's decision in
 
 City of Arlington v. Federal Communications Commission
 
 ,
 
 569 U.S. 290
 
 ,
 
 133 S.Ct. 1863
 
 ,
 
 185 L.Ed.2d 941
 
 (2013), in their supplemental briefs. We have not previously addressed the effect-if any-
 
 City of Arlington
 
 might have on our application of the
 
 Mead
 
 inquiry. But we do note that Justice Scalia, writing for the majority in
 
 City of Arlington
 
 , reaffirmed that courts must determine whether
 
 Chevron
 
 or
 
 Mead
 
 controls at step zero.
 
 See
 

 133 S.Ct. at 1874
 
 ("The dissent is correct that
 
 United States v. Mead
 
 requires that, for
 
 Chevron
 
 deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted.
 
 No one disputes that
 
 ." (emphasis added)).
 

 Although the record does not indicate exactly how long the EPA's interpretation of "disproportionate economic hardship" has been in place, as a matter of logic, the EPA's interpretation must have been derived in 2011 at the earliest (the year that DOE released its second study).
 

 The dissent describes this sentence as "regrettably inartful," claiming that the EPA did not mean what it said, but rather applied DOE's viability metrics in a "nuanced analysis." Diss. at 1. But, as we have shown above, we do not read this sentence in isolation. And, in any event, the EPA repeats this language in its advocacy before us, using it to describe the test it applied in resolving Sinclair's petitions.
 

 "Viability" is a term of art for purposes of EPA's assessment of petitions for small refinery exemptions. ... EPA has also described this factor as
 
 requiring
 
 a small refinery to "show that it faces RFS compliance costs that would 'significantly impact the operation of the firm, leading eventually to an inability to increase efficiency to remain competitive, eventually resulting in closure.' "
 

 Aple. Br. at 40 n.11 (internal citations omitted) (emphasis added).
 

 We reject the EPA's argument that Sinclair "waived" its statutory interpretation argument by failing to raise it during the administrative proceedings.
 
 See
 
 Aple. Br. at 32-33. Sinclair fully explained its understanding of the statutory term as informed by DOE's exemption study and recommendation that Sinclair was eligible for a 50 percent exemption. And, in any event, statutory interpretation is the specialization of the courts, not the agencies.
 
 See
 

 Frontier Airlines, Inc. v. Civil Aeronautics Bd.
 
 ,
 
 621 F.2d 369
 
 , 371 (10th Cir. 1980) ("The general rule requiring exhaustion of remedies before an administrative agency is subject to an exception where the question is solely one of statutory interpretation.").