**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**October 17, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

SUNCOR ENERGY (U.S.A.), INC.,

    Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

    Respondent.

No. 19-9612

_____

**Petition for Review from an Order of the**
**Environmental Protection Agency**
_____

Sean Marotta (Danielle Desaulniers Stempel, with him on the briefs), Hogan Lovells US
LLP, Washington, DC, appearing for Petitioner.

Caitlin McCusker, Attorney, Environment and Natural Resources Division, United States
Department of Justice, Washington, DC (Todd Kim, Assistant Attorney General,
Environment and Natural Resources Division, United States Department of Justice,
Washington, DC, and Susan Stahle, Attorney, Office of the General Counsel, United
States Environmental Protection Agency, Washington, DC with her on the brief),
appearing for Respondent.
_____

Before **HOLMES**, Chief Judge, **BRISCOE** and **MORITZ**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

    Petitioner Suncor Energy (U.S.A.) Inc. (Suncor) owns and operates two adjacent

oil refining operations in Commerce City, Colorado.  Those operations are commonly

known as the East Refinery and the West Refinery.  In December 2018, Suncor filed with

the United States Environmental Protection Agency (EPA) two petitions, one for the East

Refinery and one for the West Refinery, seeking an extension of a temporary exemption

that Congress had granted to "small refineries" from complying with the Clean Air Act's

Renewable Fuel Standard Program.  The EPA denied the two petitions in a written

decision issued on October 25, 2019.  Suncor then filed a timely petition for review of the

EPA's decision with this court.  Exercising jurisdiction pursuant to 42 U.S.C.

§ 7607(b)(1), we grant Suncor's petition for review, vacate the EPA's decision, and

remand to the EPA for further proceedings.

I

*a) The Renewable Fuel Standard Program*

"In 2005, Congress amended the Clean Air Act to establish the Renewable Fuel

Standard . . . Program" (RFS Program).  *Growth Energy v. Envtl. Prot. Agency*, 5 F.4th 1,

7 (D.C. Cir. 2021) (citing Energy Policy Act of 2005, Pub. L. No. 109–58, 119 Stat. 594).

The RFS Program, with a goal of "mov[ing] the United States towards greater reliance on

clean energy, . . . calls for annual increases in the amount of renewable fuel introduced

into the U.S. fuel supply." *Id*.  More specifically, the RFS Program calls for increasing

annual "applicable volumes" of four categories of renewable fuel for the transportation

sector: total renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based

diesel. 42 U.S.C. § 7545(o)(2)(B)(i)(I)–(IV).  The specified applicable volumes for these

first three categories are prescribed by statute for each year through 2022, and for

2

biomass-based diesel through 2012.[1]  *Id*.  For subsequent years, the EPA is directed by statute to determine the applicable volumes.  *Id*. § 7545(o)(2)(B)(ii).

Congress directed the EPA to promulgate regulations "contain[ing] compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate." *Id*. § 7545(o)(2)(A)(iii)(I).  Although Congress did not define the term "refinery" in the Clean Air Act, the EPA had in place, at the time that Suncor filed its petitions in this case, a regulation that defined "refinery" to mean "any facility, including but not limited to, a plant, tanker truck, or vessel where gasoline or diesel fuel is produced, including any facility at which blendstocks are combined to produce gasoline or diesel fuel, or at which blendstock is added to gasoline or diesel fuel."[2]  40 C.F.R. § 80.2(h) (2019).

Congress afforded a "temporary exemption" from the RFS Program for "small refineries." 42 U.S.C. § 7545(o)(9)(A); *see* 40 C.F.R. § 80.1441.  That "temporary exemption" effectively includes three components.  First, Congress granted all small refineries a blanket exemption from the requirements of the RFS Program through 2011. 42 U.S.C. § 7545(o)(1)(K), (o)(9)(A)(i).  Second, Congress directed the Department of

---

[1]  For example, "[f]or 2006, Congress ordained the inclusion of 4 billion gallons of renewable fuel in the Nation's fuel supply." *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Assoc.*, 141 S. Ct. 2172, 2175 (2021).  "By 2022, the number will climb to 36 billion gallons." *Id*.

[2] The EPA has since amended this regulation to remove the subsections. *See* Fuels Regulatory Streamlining, 85 Fed. Reg. 78412, 78415, 78465–66 (Dec. 4, 2020).  The regulatory definition of "refinery," however, remains the same.

Energy (DOE) to conduct a study "to determine whether compliance with the requirements of [the RFS Program] would impose a disproportionate economic hardship on small refineries," and it in turn directed the EPA to extend the temporary exemption "for a period of not less than 2 additional years" for any small refineries identified by the DOE.[3]  *Id*. § 7545(o)(9)(A)(ii)(I), (II).  Third, Congress authorized small refineries "at any time" to "petition the Administrator for an extension of the [temporary statutory] exemption . . . for the reason of disproportionate economic hardship."  *Id*. § 7545(o)(9)(B)(i); *see* 40 C.F.R. § 80.1441(e)(2).  In *HollyFrontier*, the Supreme Court interpreted this statutory extension provision to mean that "[a] small refinery can apply for (if not always receive) a hardship extension 'at any time,'" even if it saw a lapse in exemption coverage in a previous year.  141 S. Ct. at 2181.

Congress defined the phrase "small refinery" in the Clean Air Act to "mean[] a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels."  42 U.S.C. § 7545(o)(1)(K).  The EPA's own regulations define the phrase "small refinery" in an identical manner, i.e., to mean "a refinery for which the average aggregate daily crude oil throughput (as

---

[3] The EPA, pursuant to the findings of the DOE, extended the blanket exemption through 2013 for certain refineries.  *See HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2176 (2021).  This extension, however, did not cover Suncor's Commerce City facilities.

determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels." 40 C.F.R. § 80.1401.

b) *Suncor and its East and West Refineries*

Suncor owns and operates what it refers to as the East Refinery and the West Refinery. The East Refinery and the West Refinery are located next to each other in Commerce City, Colorado, which is situated north and east of downtown Denver (the photograph below was taken from the northeast side of Suncor's facilities looking southwest). Suncor purchased the West Refinery facility in 2003 from ConocoPhillips. Suncor purchased the East Refinery facility in 2005 from Valero Energy.



5

According to Suncor, the East Refinery and the West Refinery separately report their annual crude oil processing throughput data to the Energy Information Administration (EIA).  The EPA uses the data reported to the EIA to determine a refinery's crude oil throughput.

*c) Suncor's petitions for small refinery exceptions*

On December 28, 2018, Suncor filed with the EPA two petitions for extension of the small refinery exception: one for the East Refinery and another for the West Refinery. The petition for the East Refinery alleged that in 2017 the East Refinery "had an average aggregate daily crude oil throughput of no greater than 75,000 barrels per day (bpd) (34,710 bpd for 2017)," and it projected that the average aggregate daily crude oil throughput for 2018 would "remain[] less than 75,000 bpd (32,489 bpd projected for 2018)."  JA at 1.  Similarly, the petition for the West Refinery alleged that in 2017 the West Refinery "had an average aggregate daily crude oil throughput of no greater than 75,000 barrels per day (bpd) (63,819 bpd for 2017)," and it projected that the average aggregate daily crude oil throughput for 2018 would "remain[] less than 75,000 bpd (67,528 bpd projected for 2018)."  *Id*. at 24.

In July 2019, the EPA contacted Suncor and noted that, "[b]ased on the gasoline and diesel production in the RFS [Program] compliance spreadsheet" that Suncor submitted, "it look[ed] like the East and West refineries [we]re probably operating on an integrated basis."  *Id*. at 54.  To help it "better understand the level of integration between" the East Refinery and the West Refinery, the EPA asked Suncor to provide the

EPA with information "showing the stream flows (including approximate volumetric flowrates) between the East and West refineries." *Id*. Suncor responded by stating, in pertinent part, that it "respectfully disagree[d] with any attempt to characterize the . . . West Refinery and the . . . East Refinery as an integrated refinery for purposes of the evaluation of its Petitions." *Id*. at 56. Suncor in turn asserted that "[t]he legal test for determining whether a refinery qualifies for an extension of its hardship exemption is set forth in 40 C.F.R. § 80.144(e)(2) and § 80.1401," and "is based solely on the ***daily average crude oil throughput*** at each refinery during the applicable calendar years." *Id*. (emphasis in original). "Any other factors," Suncor asserted, such as "the products produced, the precise manner in which they are produced, or arguments about a refinery's level of integration," "are legally irrelevant for determination of whether a refinery qualifies as a 'small refinery.'" *Id*.

Because Suncor did not provide the EPA with any additional information, the EPA "conduct[ed] its own research to understand the present operating configuration of Suncor's Commerce City Refinery." *Id*. at 75. Thereafter, on October 25, 2019, the EPA sent a letter to Suncor concluding "that the East Refinery and the West Refinery [we]re not eligible to petition for a small refinery exemption." *Id*. at 73. The EPA began by noting:

> The statute does not define the word "refinery" or the phrase "average aggregate daily crude oil throughput" in the "small refinery" definition. EPA has promulgated various definitions of the word "refinery" in its regulations which are informative but not definitive for this evaluation. EPA has not defined the phrase "average aggregate daily crude oil

7

throughput" in its regulations. The statutory and regulatory definitions
provide neither guidance nor limits on how EPA must evaluate the words
and phrases in the definition when determining whether a refinery meets
the "small refinery" definition. EPA therefore has discretion to choose
what factors and information it will consider in this evaluation.

*Id*. at 74 (footnote omitted).

The EPA in turn noted that in reaching its conclusion, it "considered the extent of

Suncor's integration of the East Refinery and the West Refinery with respect to

production of non-renewable gasoline and diesel fuel since annual non-renewable

gasoline and diesel fuel production volume is the primary basis for determining Suncor's

obligation to comply with the RFS program." *Id*. The EPA noted in particular that

"Suncor's East Refinery partially processes crude oil into gasoline blending components

and intermediate distillate feedstocks that are ultimately converted into gasoline, CBOB

[(conventional gasoline blendstock for oxygenate blending)], and ULSD [(ultra low

sulfur diesel)] in the West Refinery." *Id*. The EPA "[t]herefore . . . consider[ed] the

aggregate volume of crude oil distilled at both the East Refinery and the West Refinery

when determining the eligibility of the East Refinery and the West Refinery to petition as

small refineries for an exemption from the RFS." *Id*. (footnote omitted). The EPA

acknowledged "that the East Refinery and the West Refinery were among the small

refineries that received the original small refinery exemption in 2006," but noted that

Suncor has since done significant work to integrate the process operations
of the two facilities so that they now function as a single refinery with an
average aggregate daily crude oil throughput that exceeded 75,000 bpd in
2017 and 2018 and thus no longer meet the definition of a small refinery.

8

*Id.* In support, the EPA noted that, based upon its research, one of Suncor's two operations was primarily used to process crude oil into intermediate products and the other of the two operations was in turn primarily used to process those intermediate products into final products like gasoline and diesel. *Id.* at 74–76.

The EPA also noted that Suncor "routinely characterizes the East Refinery and the West Refinery as a single refinery — the Commerce City Refinery — in both public presentations and business reports." *Id.* at 76. For example, the EPA noted:

> • Suncor's website describes the Commerce City Refinery as a "98,000-barrel-per-day refinery [that] produces gasoline, diesel fuel and paving-grade asphalt."
>
> • Suncor's 2018 Annual Report lists the Commerce City Refinery as a single, 98,000 bpd refinery.
>
> • Suncor described the Commerce City Refinery as a "nominal 90,000 bpd Fuels Refinery in a June 10, 2010 presentation to the Crude Oil Quality Association.
>
> • In a 2005 article following Suncor's acquisition of the East Refinery from Valero, the Oil and Automotive Marketing News quotes Suncor President and CEO, Rick George, as stating, "This acquisition provides an immediate expansion of our presence in the Rocky Mountain marketplace," and, "With a capacity of 90,000 barrels per day, the integrated operation is expected to be more competitive with refineries in Texas and Oklahoma."

*Id.* (footnotes omitted).

Lastly, the EPA pointed to "the unified management chain at the Commerce City Refinery and its operation as a single profit center." *Id.* The EPA noted in support:

> There is one vice president for the Commerce City Refinery: Donald Austin. Mr. Austin, as vice-president of the Commerce City Refinery, "is responsible for providing overall leadership for safe, reliable and profitable operations, and is also accountable for environmental compliance and quality of ***the facility***." Suncor did not submit to the EPA financial data for

9

> a separate East Refinery and a West Refinery, but rather provided only aggregated financial information for the whole Commerce City Refinery in its PI-588 form and financial statements.

*Id*. at 76–77 (emphasis in original) (footnotes omitted).

The EPA acknowledged but rejected Suncor's assertion "that the East Refinery and the West Refinery should be considered separate facilities because they have been issued separate EPA facility identification ("ID") numbers for use in EPA's gasoline programs and Title V air permitting," or because those ID numbers "are referenced by these separate facility ID numbers in EPA consent decrees." *Id*. at 77. The EPA noted in support:

> These separate facility ID numbers were issued and referenced when each refinery was owned by previous, separate owners, in contrast to the current Suncor ownership and operation of the single integrated refinery. Additionally, the objectives of the above-mentioned programs — regulating the Reid vapor pressure, sulfur, and benzene content of gasoline, or regulating stack emissions from the fired heaters or boilers — are very different than those of the RFS program, where compliance (and, threshold definitional eligibility for an exemption) is based primarily on annual transportation fuel production volume. Since these programs have separate objectives that are unrelated to the objectives of the RFS program, they are not relevant to EPA's consideration of Suncor's eligibility as a small refinery under the RFS program.

*Id*. (footnote omitted). Lastly, the EPA "note[d] that Suncor failed to mention that the East Refinery and the West Refinery are registered as a single facility (facility ID 82133) under EPA's diesel sulfur program, consistent with EPA's description of Suncor's integrated ULSD production above." *Id*. Indeed, the EPA noted that, in Suncor's cover letter that accompanied its registration form for the EPA's diesel sulfur program, Suncor

10

stated: "Our intent is to operate these facilities as a single refinery with respect to EPA's Clean Diesel Program." *Id.* (quotation marks and footnote omitted).

The EPA concluded its letter by stating:

> Based on the information available to EPA, including Suncor's own statements, it is evident that the Suncor East Refinery and the West Refinery have been integrated to the point that they are now operated as a single refinery with an average daily crude oil throughput that exceeded 75,000 bpd in both 2017 and 2018. * * * In order to properly account for the integrated nature of Suncor's operation, the most reasonable boundary is one encompassing both refineries in order to combine the average aggregate daily crude oil throughput and the overall transportation fuel production volume from both refineries' operations.

> Given the preceding analysis and cited information, EPA has determined that Suncor's East Refinery and Suncor's West Refinery do not meet the definition of "small refinery" in the CAA and the regulations; therefore, these entities are ineligible to petition for a small refinery exemption. Accordingly, EPA is declining to evaluate Suncor's 2018 petitions for a one-year small refinery exemption for these entities. The effect of this determination is that as of January 1, 2018, the gasoline and diesel production from the Commerce City Refinery remains subject to the percent standards of 40 CFR § 80.1405, and the Commerce City Refinery is subject to all other requirements applicable to obligated parties.

*Id.* at 77–78.

On December 23, 2019, Suncor initiated these proceedings by filing a petition for review of the EPA's October 25, 2019 decision.

II

Suncor raises two issues in its petition for review. First, Suncor argues that the East Refinery and the West Refinery each satisfy the Clean Air Act's definition of "small refinery" and the EPA's identical regulatory definition of that phrase, but that the EPA

11

ignored the plain meaning of those definitions and effectively rewrote them by assessing whether the East Refinery and the West Refinery were so "integrated" that they must be treated as a single refinery. Second, Suncor argues that even if the Clean Air Act permitted the EPA to consider integration or other factors as part of its determination of whether the East Refinery and West Refinery constituted "small refineries," the EPA's development and application of those standards in this case was arbitrary and capricious. As we shall proceed to discuss, we reject Suncor's first argument and conclude that the statutory and regulatory definition of "small refinery" is ambiguous as applied to the East Refinery and the West Refinery. But we agree, in part, with Suncor's second argument and, therefore, grant its petition for review, vacate the EPA's decision, and remand this matter to the EPA for further review.

*Standards of review*

We review Suncor's petition for review under the Administrative Procedure Act (APA). *Sinclair Wyoming Refining Co. v. United States Environmental Protection Agency*, 887 F.3d 986, 990 (10th Cir. 2017). The APA requires courts, in pertinent part, to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). In conducting our review under the APA, we "review questions of statutory interpretation de novo." *Sinclair*, 887 F.3d at 990.

*Did the EPA ignore the plain meaning of the Clean Air Act's definition of "small refinery" and the EPA's own regulatory definition of "refinery"?*

Suncor argues that the EPA ignored the plain meaning of the Clean Air Act's definition of "small refinery" and the EPA's own regulatory definition of "refinery," and effectively rewrote those definitions in this case by assessing whether the East Refinery and the West Refinery were so "integrated" that they must be treated as a single refinery. Suncor argues in support that "[t]he plain meaning and statutory and regulatory definition of 'small refinery,' 'refinery,' and all of the associated words are clear and unambiguous" and, as a result, the "EPA has no discretion to interpret those terms." Aplt. Br. at 15.

Curiously, the EPA, in its appellate response brief, makes two alternative arguments regarding how it arrived at its decision to deny Suncor's petitions. First, the EPA argues that it "did not purport to interpret the statutory definition of 'small refinery' in adjudication of the petitions, but rather made a purely factual determination that the East and West facilities were components of a single refinery." Aple. Br. at 15–16. Second, and alternatively, the EPA argues that "[t]o the extent that [it] construed the statute at all, it addressed the statute's silence on the question before it in a reasonable and persuasive manner, and the Court should defer to that reasoning" under *Skidmore v. Swift*, 323 U.S. 134 (1944). *Id*. at 16.

We conclude that the EPA's first argument is belied by the record and, in any event, cannot be reconciled with the statutory and regulatory framework that applies to Suncor's petitions. In its decision denying Suncor's petitions, the EPA began by noting:

13

> The [Clean Air Act] does not define the word "refinery" or the phrase "average aggregate daily crude oil throughput" in the "small refinery" definition. EPA has promulgated various definitions of the word "refinery" in its regulations which are informative but not definitive for this evaluation. EPA has not defined the phrase "average aggregate daily crude oil throughput" in its regulations. *The statutory and regulatory definitions provide neither guidance nor limits on how EPA must evaluate the words and phrases in the definition when determining whether a refinery meets the "small refinery" definition. EPA therefore has discretion to choose what factors and information it will consider in this evaluation.*

*Id*. at 74 (emphasis added) (footnote omitted). The EPA then considered at length the individual circumstances of Suncor's East Refinery and West Refinery. Ultimately, the EPA concluded that, based upon its own "analysis and cited information," the East Refinery and West Refinery were "operat[ing] as a single refinery with an average daily crude oil throughput that exceeded 75,000 bpd in both 2017 and 2018," *Id*. at 77, 78. Consequently, the EPA "determined that Suncor's East Refinery and Suncor's West Refinery *d[id] not meet the definition of 'small refinery' in the CAA and regulations*." *Id*. at 78 (emphasis added).

In sum, the EPA's own written decision indicates that the EPA concluded that the statutory and regulatory definitions of "small refinery" did not provide specific "guidance []or limits" on how the terms "refinery" and "average aggregate daily crude oil throughput" should be "evaluated." *Id*. at 74. Accordingly, the EPA proceeded as though it "ha[d] discretion to choose what factors and information it w[ould] consider in this evaluation." *Id*. In other words, it is plain from the record that the EPA effectively treated the term "refinery" as ambiguous, and it in turn exercised its discretion to

14

interpret and apply that statutory term by identifying several factors that it believed were relevant to determining whether the East Refinery and West Refinery each qualified as "refineries."  The EPA also, after exercising its discretion to interpret and apply the statutory term, made a factual determination regarding whether the East Refinery and West Refinery operated together to produce final products.

In its alternative argument, the EPA argues that the Clean Air Act "does not provide guidance or limits concerning how EPA should determine the boundaries of 'a refinery.'"  Aple. Br. at 37.  "Instead," the EPA argues, "the statute leaves open the important question of how to determine what constitutes 'a refinery' suggesting that 'Congress has delegated to the EPA some discretion in determining whether, in its expert opinion, a petitioner has presented sufficient evidence' to demonstrate its eligibility."  *Id*. (quoting *WildEarth Guardians v. EPA*, 728 F.3d 1075, 1082 (10th Cir. 2013)). "Further," the EPA argues, "the term 'refinery' must be examined in context with the overall RFS program and as part of 'a symmetrical and coherent regulatory scheme.'"  *Id*. (quoting *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000)).  The EPA in turn argues that "[n]othing in the statute compels EPA to adopt the broadest possible construction of a 'refinery' as Suncor urges."  *Id*. at 38.  The EPA notes that it "has also defined the word 'refinery' differently in the context of different regulatory programs depending on their unique structure and purpose," and "[i]n its decision letter, EPA noted two 'informative' instances where it defined 'refinery' and 'petroleum refinery.'"  *Id*. at 38–39 (quoting App. at 74 & n.7).  Lastly, the EPA argues that Suncor's

15

"reading would subvert the RFS program and its small refinery exemption by permitting obligated refineries to draw imaginary lines between its buildings or equipment when petitioning for a small refinery exemption, simply to evade RFS compliance obligations." *Id.* at 39. "It cannot be the case," the EPA argues, "that owners of refineries are free under the statute to subdivide their refining operations into smaller and smaller pieces such that each component processes less than 75,000 barrels of crude oil per day and is thus eligible to petition independently for a small refinery exemption." *Id.*

With these arguments in mind, we turn first to the text of the Clean Air Act. The Clean Air Act defines the phrase "small refinery" to mean "a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels." 42 U.S.C. § 7545(o)(1)(K). The EPA's own regulations contain an identical definition of the phrase "small refinery." 40 C.F.R. § 80.1401. As we interpret this definition, two requirements must be satisfied. First, there must be a "refinery." Second, the "average aggregate daily crude oil throughput" of that refinery "for a calendar year" must "not exceed 75,000 barrels."

The Clean Air Act does not define the word "refinery." Suncor, citing the lack of a statutory definition, asserts that "[t]he common meaning of 'refinery' is 'a building and equipment for refining or purifying metals, oil, or sugar.'" Aplt. Br. at 14 (quoting *Refinery*, Webster's Third New Int'l Dictionary 1908 (2002)). We conclude, however, that this common meaning of the term "refinery" is ambiguous as applied to the facts

16

found by the EPA in this case.  That is because the East Refinery and the West Refinery

could each be considered a "refinery," since they are each comprised of  buildings and

equipment that are used to refine oil, but they could also together be considered a

"refinery" because, collectively, the buildings and equipment from both operations are

used to refine crude oil into final products such as gasoline and diesel.

The EPA has statutory authority to "prescribe such regulations as are necessary" to

carry out its functions under the Clean Air Act.  42 U.S.C. § 7601(a).  At the time it

denied Suncor's petitions, the EPA had in place a regulation, 40 C.F.R. § 80.2(h), that

defined the term "refinery" in the following manner:

> Refinery means any facility, including but not limited to, a plant, tanker
> truck, or vessel where gasoline or diesel fuel is produced, including any
> facility at which blendstocks are combined to produce gasoline or diesel
> fuel, or at which blendstock is added to gasoline or diesel fuel.

40 C.F.R. § 80.2(h) (2019).[4]  Suncor argues that this definition is unambiguous and

supports its position that the East Refinery and the West Refinery each qualify as a

"refinery" for purposes of the Clean Air Act.  Aplt. Br. at 14 ("To the extent there is any

doubt about what constitutes a 'refinery,' EPA's own definition leads to the same

conclusion.").  The EPA, in contrast, asserts that this regulatory definition "fails to

resolve the central question" because "[w]hile the East and West facilities satisfy that

---

[4] The EPA's regulations specify that "[t]he definitions of § 80.2" apply to the RFS
Program.  40 C.F.R. § 80.1401 (2019).

regulatory definition, so does the Commerce City Refinery as a whole." Aple. Br at 40. In other words, the EPA asserts that this regulatory definition is ambiguous as applied to the circumstances at issue here.

We agree with the EPA, but with one important caveat. The EPA's 2019 regulatory definition of "refinery" employs, but does not define, the term "facility." Dictionaries commonly define the term "facility" in a broad manner to mean "the physical means or equipment required for doing something." Oxford English Dictionary (3d Ed. 2007; modified version published online Dec. 2021). Under this common definition, the East Refinery and the West Refinery could each qualify as a "facility," but they could also qualify as a "facility" if considered together.[5]

The EPA's 2019 regulatory definition of "refinery" also employs, but does not define, the term "produced." The term "produce" is commonly defined to mean "[t]o bring (a thing) into existence from its raw materials or elements, or as the result of a process; to give rise to, bring about, effect, cause, make (an action, condition, etc.)." *Id*. The problem with this definition, as applied to the fact pattern presented here, is that it fails to meaningfully distinguish between a facility that handles all of the steps of "producing" gasoline or diesel fuel and a facility that handles only some of the steps of

---

[5] Suncor points to a slightly different dictionary definition that defines "a facility [a]s 'something . . . that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end.'" Aplt. Br. at 14 (quoting *Facility*, Webster's Third New Int'l Dictionary 812–813 (2002)). This definition suffers from the same as-applied ambiguity as the definition we have cited.

"producing" gasoline or diesel fuel.  As we have noted, the evidence in the record, as compiled by the EPA, indicates that the East Refinery and the West Refinery each played some role in the production of gasoline and diesel fuel, but that the two facilities were interdependent and, generally speaking, worked together to produce those products.

In sum, applying the common definitions of "facility" and "produced" to the EPA's 2019 regulatory definition of "refinery," the East Refinery and the West Refinery could each potentially be classified as a "refinery" because they each played some role in the conversion of crude oil into gasoline and diesel, but yet the East Refinery and West Refinery, together, could also be considered a single "refinery" because, as explained, they work together to convert crude oil into gasoline and diesel.  Thus, when applying the common definitions of "facility" and "produced" to the EPA's 2019 regulatory definition of "refinery," we are left with "a choice between (or among) more than one reasonable reading."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019).

All of this said, we note that the parties have ignored another EPA regulation that appears to us to have relevance to the EPA's determination of whether the East Refinery and West Refinery should each be considered "small refineries" for purposes of the RFS Program.  At the time of the EPA's decision in this case, the regulatory "Definitions" section that is specific to the RFS Program, 40 C.F.R. § 80.1401, defined the term "facility" to mean

> all of the activities and equipment associated with the production of
> renewable fuel starting from the point of delivery of feedstock material to
> the point of final storage of the end product, which are located on one

19

property, and are under the control of the same person (or persons under common control).

40 C.F.R. § 80.1401 (2019).[6]  We think it fair to assume that the agency intended for this

regulatory definition of "facility" to be incorporated into its regulatory definition of

"refinery" set forth in § 80.2(h).  Curiously, however, the EPA's decision in this case

made no mention of this regulatory definition of "facility," and the parties' appellate

briefing does not cite, let alone discuss, this regulatory definition.  Consequently, we

decline to interpret or apply the regulatory definition of "facility" in the first instance to

the facts presented here.  But, absent further explanation from the EPA, we are left to

conclude that the EPA's decision in this case, by wholly ignoring its own regulatory

definition of "facility," was "not in accordance with law."[7]  5 U.S.C. § 706(2)(A); *see*

*Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021) (noting that federal

regulations "carry the force of law"); *Atlantis Exp., Inc. v. Standard Transp.  Serv., Inc.*,

---

[6] The EPA has since revised this regulatory definition slightly to read: "all of the activities and equipment associated with the production of renewable fuel *or a biointermediate* starting from the point of delivery of feedstock material to the point of final storage of the end product, which are located on one property, and are under the control of the same person (or persons under common control)."  40 C.F.R. § 80.1401 (2022) (emphasis added).

[7] This reason alone would justify reversing the EPA's decision and remanding to the agency for further review.  For purposes of judicial efficiency, however, we proceed to address Suncor's second argument regarding the EPA's interpretation of the statutory and regulatory term "refinery."

955 F.2d 529, 534 n.9 (8th Cir. 1992) (holding that federal regulations, until repealed, "have the force of law").

*Is the EPA's interpretation of the statutory and regulatory term "refinery" arbitrary and capricious?*

In its second issue on appeal, Suncor argues that even if it was permissible for the EPA to interpret the statutory and regulatory term "refinery" as applied to the facts of this case, the EPA's interpretation of that term is not entitled to any deference by this court and, in any event, should be rejected as arbitrary and capricious. For the reasons that follow, we conclude that the EPA's interpretation of the term "refinery" is arguably subject to *Skidmore* deference, but that, in any event, the EPA's interpretation was arbitrary and capricious in certain respects. We therefore conclude that the EPA's decision must be vacated and the matter remanded to the EPA for further consideration.

a) *Skidmore* deference

Suncor asserts that the "EPA did not claim that it was entitled to any *deference*" and "[t]hat alone is reason to stop with the plain language" of the statute. Aplt. Br. at 27 (emphasis in original). Suncor in turn argues that, "in any case, EPA's erroneous interpretation of the Clean Air Act is not entitled to *Chevron* or *Skidmore* deference, and EPA's flawed interpretation of its own regulation is not entitled to *Auer* deference." *Id.* at 28.

Addressing these arguments in turn, Suncor is wrong, as an initial matter, in suggesting that the "EPA did not claim that it was entitled to any deference." Aplt. Br. at

21

27 (emphasis omitted).  To be sure, the EPA did not directly assert in its written decision denying Suncor's petitions that its interpretation of the term "refinery" was entitled to deference.  But the EPA's explanation otherwise indicated that it considered the statutory term "refinery" to be ambiguous, and also considered its own identical regulatory definition of that term to be ambiguous for purposes of resolving whether Suncor's two facilities should be treated as separate "refineries" or one "refinery."  That contemporaneous explanation is precisely what we are called upon to review, and not any *post hoc* rationalization offered by the EPA, such as its suggestion in its appellate brief that it did not interpret the term "refinery" and simply made a factual determination regarding the two facilities.  *See Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1263 (10th Cir. 2020) ("[W]e do not consider the agency's 'post hoc rationalizations' for [its] action.").

That leaves the question of whether we should afford any measure of deference to the EPA's decision.  When an agency reasonably interprets a genuinely ambiguous regulation that it has promulgated, federal courts generally defer to that interpretation. *Kisor*, 139 S. Ct. at 2408.  This is known as *Auer* deference.  *See Auer v. Robbins*, 519 U.S. 452 (1997); *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945). *Auer* deference is "rooted in . . . a presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities."  *Kisor*, 139 S. Ct. at 2412.  In other words, "Congress usually intends to give" agencies "considerable latitude to interpret the ambiguous rules they issue."  *Id*.  "[T]he presumption that Congress intended *Auer* deference" also "stems from the awareness that resolving genuine

22

regulatory ambiguities often entails the exercise of judgment grounded in policy concerns." *Id*. at 2413 (quotation marks and brackets omitted).  And Congress "is attuned to the comparative advantages of agencies over courts in making such policy judgments." *Id*.  Those advantages include agencies' "unique expertise, often of a scientific or technical nature, relevant to applying a regulation to complex or changing circumstances." *Id*. (quotation marks omitted).  Further, agencies "can conduct factual investigations, can consult with affected parties, [and] can consider how their experts have handled similar issues over the long course of administering a regulatory program." *Id*.  "And agencies . . . have political accountability, because they are subject to the supervision of the President, who in turn answers to the public." *Id*.

Importantly, however, the Supreme Court has emphasized "that *Auer* deference is just a general rule" that "does not apply in all cases." *Id*. at 2414 (quotation marks omitted).  Because "the administrative realm is vast and varied," the Supreme Court "ha[s] laid out some especially important markers for identifying when *Auer* deference is and is not appropriate." *Id*. at 2416.  "To begin with, the regulatory interpretation . . . must be the agency's authoritative or official position, rather than [an] ad hoc statement not reflecting the agency's views." *Id*. (quotation marks omitted).  "Next, the agency's interpretation must in some way implicate its substantive expertise." *Id*. at 2417.  "Finally, an agency's reading of a rule must reflect fair and considered judgment to receive *Auer* deference." *Id*. (quotation marks omitted).  "That means . . . that a court should decline to defer to a merely convenient litigating position or post hoc

rationalization advanced to defend past agency action against attack." *Id.* (quotation marks and brackets omitted). "And a court may not defer to a new interpretation, whether or not introduced in litigation, that creates unfair surprise to regulated parties." *Id.* (quotation marks omitted).

If *Auer* deference does not apply, there remains the possibility of *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). When a reviewing court determines that an agency's decision lacks the force of law, the court must still consider the agency's decision "under the framework set forth in *Skidmore*." *Carpio v. Holder*, 592 F.3d 1091, 1098 (10th Cir. 2010). In such a case, the reviewing court decides the case "based on [its] independent judgment and 'follow[s] [the] agency's [view] only to the extent it is persuasive.'" *Kisor*, 139 S. Ct. at 2447 (Gorsuch, J., concurring) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 269 (2006)). In other words, a reviewing court "accord[s] the [agency's] interpretation a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012) (quotation marks omitted) (applying *Skidmore* after concluding that *Auer* deference was not warranted).

In the case at hand, the text of the EPA's decision makes clear that the EPA concluded that the statutory definition of "refinery" and its own identical regulatory definition of the term "refinery" was ambiguous and that, as a result, the EPA had

24

discretion to interpret and apply that term in light of the unique factual circumstances presented in this case. There are key attributes of the EPA's decision, however, that lead us to conclude that the EPA's interpretation is not entitled to *Auer* deference and is at best entitled only to *Skidmore* deference. First, the EPA arrived at its interpretation in the course of informally adjudicating Suncor's petitions for exemptions from the RFS Program. This meant that the EPA's decision was specific not only to Suncor, but also to the East and West Refinery, and the EPA arrived at its decision on the basis of its own research regarding Suncor's operations and without any of the "'trial-like' procedures generally required by the APA." *Sinclair*, 887 F.3d at 992. Second, "the decision[] w[as] not made by the head of the EPA but instead by" a lower-level agency official. *Id*. Third, "the decision[] hold[s] no precedential value for third parties." *Id*. Indeed, "third parties have [no] access to the decision[], since the EPA does not publicly release its decisions because they contain confidential business information." *Id*. Fourth, the EPA's integration analysis "is not a longstanding practice," but instead appears to be entirely new and driven by the unique facts of this case. *Id*. Finally, as we have already noted, the EPA appears to have ignored a relevant regulatory definition—i.e., its own regulatory definition of the term "facility"—in reaching its decision in this case.

> b) *The EPA's interpretation of the term "refinery" is not entitled to deference and must be vacated*

That leaves us with the ultimate question of whether the EPA reasonably interpreted the statutory and regulatory term "refinery" in reaching its decision in this

case.  Under *Skidmore*, we "accord the [agency's] interpretation a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher*, 567 U.S. at 159 (quotation marks omitted).  This includes "the interstitial nature of the legal question, the related expertise of the agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the agency had given the question over a long period of time."  *Sinclair*, 887 F.3d at 991.

In considering the EPA's analysis in the case, we must again emphasize that the EPA appears to have ignored its own regulatory definition of "facility" in reaching its decision.  That alone, in our view, is sufficient to call into question both the thoroughness and validity of the EPA's decision.  In other words, we find it difficult to characterize the EPA's interpretation as reasonable when it clearly appears to have ignored a regulatory definition that may well have allowed it to resolve Suncor's petitions without the need to engage in any additional interpretation of the statutory and regulatory term "refinery."

Even if we were to ignore the EPA's failure to consider and apply its own regulatory definition of "facility," we are still not persuaded that the EPA's interpretation of the statutory and regulatory term "refinery" was entirely reasonable.  The EPA stated in its written decision that because "[t]he statutory and regulatory definitions provide[d] neither guidance nor limits on how EPA must evaluate the" term "refinery," it "therefore ha[d] discretion to choose what factors and information it w[ould] consider in this

26

evaluation." App. at 74. The EPA proceeded to identify four factors that it believed were relevant to its determination of whether Suncor's two adjacent operations each qualified as a "refinery." First, the EPA stated that it considered relevant "the extent of Suncor's integration of the East Refinery and the West Refinery with respect to production of non-renewable gasoline and diesel fuel since annual non-renewable fuel production volume is the primary basis for determining Suncor's obligation to comply with the RFS program." *Id*. In addition to the extent of integration of the two facilities, the EPA concluded that three other factors were relevant to its determination of whether the two operations constituted separate "refineries" or a single "refinery": (1) Suncor's characterizations of the two operations "in both public presentations and business reports"; (2) "the unified management chain at the Commerce City Refinery"; and (3) Suncor's "operation" of the East Refinery and the West Refinery "as a single profit center." *Id*. at 76.

Notably, neither the EPA's contemporaneous decision, nor its appellate brief in this case, identify any earlier or later EPA pronouncements that are consistent with its decision in Suncor's case to rely on integration, a unified management chain, and the existence of a single profit center for purposes of determining whether a facility qualified as a "refinery." That said, the EPA asserts in its appellate brief that "[p]rior to the determination here, EPA had not publicly addressed the question of whether adjacent facilities seeking an exemption were in fact components of a large, single refinery and therefore not eligible to petition for the [small refinery] exemption." Aple. Br. at 28. In

27

other words, it appears that the situation presented by the East Refinery and the West Refinery is factually unique and, as a result, the EPA has never addressed such a situation before. Consequently, while the lack of earlier and later pronouncements on this issue does not appear to be fatal to the EPA's decision, it does not lend any "power to persuade" to the EPA's decision.[8]

Turning to the individual factors cited by the EPA in its decision, we conclude that the first factor, i.e., the extent of Suncor's integration of the East Refinery and the West Refinery, is neither arbitrary nor capricious, and is generally consistent with the text of the Clean Air Act. As we have noted, both the Clean Air Act and the EPA's own regulations define the phrase "small refinery" to mean "a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels." 42 U.S.C. § 7545(o)(1)(K); 40 C.F.R. § 80.1401. Thus, as the EPA noted in its decision letter, "annual non-renewal fuel production volume is the

---

[8] Suncor argues in Issue II of its appellate brief that the EPA deviated from its prior policies and practices in making its decision in this case. Aplt. Br. at 45. More specifically, Suncor points to the EPA's "past practice of treating the East and West Refineries as separate." *Id*. The EPA, in its appellate response brief, concedes that the East Refinery and West Refinery were "issued . . . separate facility identification numbers in the context of [the EPA's] gasoline programs and its Title V air permitting program." Aple. Br. at 30–31. But, the EPA argues, "the existence of distinct identification numbers in other regulatory programs is irrelevant." *Id*. at 31. "These identification numbers," the EPA notes, "were relics from the time when the facilities were separately owned and operated." *Id*. We conclude that the EPA has the better of the argument here.

primary [statutory] basis for determining" whether Suncor was obligated to comply with the RFS Program. JA at 74. If two purportedly independent refineries are in fact being operated as a single, integrated unit to refine crude oil into final products, then it appears entirely reasonable for the EPA to treat them as a single "refinery" and in turn examine their collective "average aggregate daily crude oil throughput" in determining whether that "refinery" qualifies as a "small refinery." Indeed, to conclude otherwise would allow refiners to characterize as "small refineries" individual portions of a larger, integrated refinery, and thereby sidestep the requirements of the RFS Program.

Importantly, however, the EPA's decision did not attempt to define integration or otherwise create any type of bright line rule that would provide Suncor or other companies with clear notice of what constitutes integration. Instead, the EPA's decision focused solely on the unique facts presented in Suncor's case. In particular, the EPA noted that "[t]he extent of integration between [the] East Refinery and West Refinery [wa]s evident in the technical and operational features of the refineries' transportation fuel production," and that the result was that "the two refineries . . . now operate as a single refinery." *Id*. at 75.

Thus, although we conclude that the level of integration can be a reasonable factor for the EPA to consider in determining whether two operations constitute separate "refineries" or a single "refinery," the problem here is that the EPA's decision does not make clear what level of integration will result in two operations being treated as a single "refinery" for purposes of the RFS Program. To be sure, it does seem clear from the

EPA's decision that if neither of the two operations independently convert crude oil into gasoline or natural gas, then the two operations must be considered integrated and, in turn, a single refinery. But those do not appear to be the facts presented here. Rather, the EPA's decision suggests that one of Suncor's operations may have produced some gasoline from crude oil, but otherwise sent most of its intermediate feedstocks to the other operation for processing into final products. Thus, it is unclear precisely how much of the "intermediate feedstocks" that are produced at one operation must remain at that operation and be converted into gasoline or diesel in order for that operation to be considered an independent "refinery." In other words, on a more generic level, it is unclear what percentage of crude oil that is processed by a particular operation must be converted into final products (gasoline or diesel) by that operation in order for it to be considered a standalone refinery[9] (or, conversely, what percentage of final products produced by an operation must have originated as crude oil at that same operation in order for it to be considered a standalone refinery). All of which means that Suncor is left without clear guidance on what it must do in order to ensure that the East Refinery and the West Refinery each qualify as "small refineries" for purposes of the RFS Program.

---

[9] Suncor refers to this in its opening brief as the EPA's "minimum-fuel-production requirement." Aplt. Br. at 44.

The validity of the second and third factors identified by the EPA in its decision—"the unified management chain at the Commerce City Refinery and its operation as a single profit center"—is more problematic. *Id.* at 76. The EPA did not explain in its decision how either of these two factors relate to the Clean Air Act's definition of "refinery," or more generally, the purposes of the RFS Program. Unlike the integration factor identified by the EPA, the "unified management chain" and "single profit center" factors have no apparent relation to RFS Program generally or, more specifically, to the key element identified by Congress in determining a "small refinery," i.e., the average daily throughput of crude oil. Because of this, it was incumbent upon the EPA to provide some type of explanation for how these factors relate to the definition of "refinery." Absent such an explanation—and the EPA's decision contains no such explanation—these factors do not have the power to persuade and instead are arbitrary and capricious.

Ultimately, given the deficiencies we have identified in the EPA's decision, we must vacate the EPA's decision and remand to the agency for further proceedings on Suncor's petitions. That does not mean that the EPA could not again arrive at the same conclusion. But, to do so, the EPA would need to (a) either consider and apply its own regulatory definition of "facility" to the circumstances presented here or explain why that regulatory definition is inapplicable, (b) provide clear guidance on its integration analysis, to the extent it continues to rely on that factor, and (c) omit any consideration of Suncor's management structure or public statements unless it can demonstrate that those

factors are somehow consistent with, and have a reasonable connection to, the statutory and regulatory definitions of the term "refinery."

### III

We hereby GRANT Suncor's petition for review, VACATE the EPA's decision, and REMAND this matter to the EPA for further proceedings consistent with this opinion.

We GRANT both of Suncor's unopposed motions to seal.  Suncor may file a limited portion of the joint appendix under seal and provide partially redacted copies for the public record, and also file Attachment A of its final opening brief (EPA's decision letter) under seal.